GULF & WESTERN CORPORATION,
Plaintiff,

v.

CRAFTIQUE PRODUCTIONS,
INC., Defendant.

No. 81 Civ. 0599 (CBM).

United States District Court,
S. D. New York.

March 3, 1981.

**604**

Proskauer, Rose, Gertz & Mendelsohn, New York City, by Jeffrey Schreier, New York City, for plaintiff.

Bromberg, Gloger, Lifschultz & Marks, New York City, by Theodore L. Marks, New York City, for defendant.

1. Transcript references are given by stating the page number first, and in certain case, stating

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

MOTLEY, District Judge.

Plaintiff is a New York corporation wholly owned by Gulf & Western Industries, Inc. Bookthrift is a Simon & Schuster division of plaintiff. (Tr. 2).[1] Michael Shimkin ("Shimkin") was a founder and sole owner of Bookthrift, a consultant to Simon & Schuster and an officer of defendant Craftique Productions, Inc. ("Craftique"). Arthur Mills ("Mills") was president of Craftique. 442(7).

Defendant is a Connecticut corporation. Seventy-five percent of its stock is owned by Creative Marketing Group, Inc. ("Creative Marketing") [Tr. 457], a wholly-owned subsidiary of Curtis Publishing Company, Inc. ("Curtis") a holding company. [Tr. 457]. The other twenty-five percent of its stock is at present the subject of a prejudgment order of attachment obtained by Curtis in the United States District Court for the District of Connecticut. [Ex B to Merritt Aff]. The shares representing this 25% interest are held by Arthur Mills, Craftique's former president. [Tr. 457].

Late in 1979, Craftique was formed by Creative Marketing and SRM, Inc., a corporation 50% of which was owned by Arthur Mills and 50% of which was owned by Michael Shimkin. [Tr. 508]. Dr. Cory Servaas has been president of the Curtis Publishing Company ("Curtis") during all times relevant to this action. 592(14)–595(3). William Gardiner, served as vice president and secretary of the Curtis. He was also president of Creative Marketing and a director and vice president of the defendant. 499(24)–500(20). John W. Merritt became president of Craftique on or about October 27, 1980. 423(11).

A total of 19 books (the Works) are at issue in this case: six Norman Rockwell Blank Books, ten State Edition Blank Books, "The Elf Blank Book", "Baby's Own Book," and "A Family Tree". 34(16)–35(6).

the number of the particular line on that page in parenthesis.

This litigation involves a disagreement over which of the parties may legally manufacture and sell the Works; in what markets the sales may be made; and the duration of any manufacturing and marketing rights arising out of a written contract between the parties which plaintiff claims has been breached by defendant, resulting in irreparable injury to plaintiff.

Plaintiff, Gulf & Western Corporation, brought this matter on by order to show cause for a temporary restraining order on Friday, January 30, 1981. On the same day, after hearing from both plaintiff and defendant, this court issued a temporary restraining order prohibiting defendant from selling, marketing, or disposing of the Works. The TRO was extended pending hearing and determination of the instant motion for preliminary injunction. Testimony was taken on February 11, 12, 17, 18, 19 and 23, 1981. Oral argument was heard on February 24, 1981. For the reasons given below, plaintiff's request for preliminary relief is granted.

The court finds that the sales and profits plaintiff would lose as a result of defendant's breach of the agreement between the parties would be difficult to ascertain. (Tr. 57–58, 82, 142–143, 151). The breach by defendant has resulted in a break in the continuity of sales to customers which plaintiff had established in the specialized market. (Tr. 56, 57, 150, 154). Plaintiff has also been prevented from approaching the largest prospective markets for the Works because of the disruption in its supply. (Tr. 56–57, 150, 157, 160, 220–21, 222, 229–30, 268–69).

Plaintiff's markets for the Works are such that one cannot anticipate the magnitude of the response until the product is actually offered for sale in those markets. (Tr. 57–58, 59). This is particularly true of the Premium and Special Sales Division of Simon & Schuster, which contacts large banks, corporations, and associations to sell books in large numbers to be offered as premiums or gifts in conjunction with various products and promotions. (Tr. 58, 59).

The court also finds that defendant's sales of the Works for the balance of the contract term would provide an inadequate basis for calculating plaintiff's damages. (Tr. 82). This is so because:

(a) With the exception of a $23,000 order for "A Family Tree" from Lillian Vernon, a customer from which plaintiff has already received large orders for one of the Works, defendant has only some $2,900 in orders for the Works. In contrast, plaintiff sold 316,271 copies of the Works from February to August, 1980. Def. Ex. k, page 3.

(b) Plaintiff has a considerably larger sales force than defendant and enjoys greater access to markets than defendant. (Tr. 58–59, 158–159, 208–209, 269–270, 432, 449–451). Plaintiff is well entrenched in those markets and has immediate entry into them. (Tr. 299–270).

(c) Defendant, until recently, had no sales organization. (Tr. 159, 433, 449). It has only recently approached independent sales organizations to market its products (Tr. 159, 432, 449) and does not enjoy Bookthrift's reputation as one of the largest and most successful distributors, or the reputation and resources of Simon & Schuster, of which Bookthrift is a division.

(d) In addition, Craftique has increased the suggested retail prices and the prices to its customers for the Works from those established by Bookthrift, which will lower the total number of sales of the Works and add to the difficulty plaintiff would have in calculating its lost profits. (Tr. 439, 464–465).

(e) Because Bookthrift has no way to determine the source of copies of books once shipped, it is likely to receive returns and issue credits for books sold by defendant. (Tr. 59, 151–52).

(f) The discontinuity caused by defendant's breach will enable competition to move in, displacing plaintiff's product. (Tr. 154, 209–10).

(g) Defendant's presence in the marketplace as a supplier of the same books would confuse plaintiff's customers. (Tr. 151–54, 431, 449).

On April 17, 1980, a meeting was held at the offices of Simon & Schuster. (Tr. 23, 290). In attendance were Arthur Mills, Neil Gerhardt, a certified public accountant and Craftique's business adviser, Michael Fine of Bookthrift and Jeffrey Goldstein, an attorney for Simon & Schuster. (Tr. 23–24, 290). Michael Shimkin was not present. (Tr. 24, 290, 339).

After considerable negotiation various terms were agreed upon in principle. During the meeting neither Mills nor Gerhardt attempted to renegotiate the prices at which defendant was then supplying copies of the Works to Bookthrift. Mr. Goldstein drafted a written agreement embodying the terms agreed upon during the morning's negotiations while the rest of the individuals involved ate lunch. After lunch the draft was extensively reviewed. Certain changes were inserted in pencil and initialled, after which the agreement was signed by Arthur Mills on behalf of defendant and Michael Fine on behalf of Bookthrift.

Under the compromise agreement of April 17 (Pl. Ex. 2, ¶ 1 & Ex. A thereto), Craftique granted to Bookthrift "exclusive rights for a period of two years . . . to publish, sell, market, distribute, advertise and promote throughout the world to all book and department stores (including book chains)," certain books, including the "Elf Blank Book" (Pl. Ex. 3D), six (6) Norman Rockwell Blank Books (Pl. Exs. 3A–C, 5A–C), ten (10) State Edition Blank Books (Pl. Ex. 3E (Hawaii)), "A Family Tree" (Pl. Ex. 3G), and "Baby's Own Book." (Pl. Ex. 3F).

The agreement of April 17 further provided that, if the parties, after good faith negotiations, failed to agree upon the marketing of future products and a resolution of the existing dispute concerning market rights in other than book and department stores had not been effected by May 12, 1980, Bookthrift shall have the same exclusive rights "in all other markets throughout the world" until May 12, 1981. (Ex. 2, ¶¶ 5(a) & (b); Tr. 337–38). The agreement also provided that for forty-five days from this date (April 17, 1980), Bookthrift had the right to reorder certain of the titles at specified prices. (Pl. Ex. 2, ¶ 3).

The agreement also provided that, apart from those prices guaranteed for the 45 days,

"at any time that Bookthrift has rights in and to the Works, Craftique shall make available to Bookthrift, at a price to be mutually agreed upon, but in additional quantities no less than those quantities provided for in Paragraph 3, additional copies of the Works for sale by Bookthrift within its exclusive markets. In the event the parties cannot agree on the per unit price of such additional copies, Craftique agrees to promptly provide Bookthrift (at Bookthrift's expenses for duplication) with duplicate original film for the Works and Bookthrift shall have the right to manufacture and sell the Works at its sole cost and expense. On any copies manufactured by Bookthrift, Craftique shall receive a royalty of not less than seven and one-half (7½%) percent of the suggested retail price on net sales (gross sales less returns).* *Any higher rate will be part of the negotiation referred to in Paragraph 5(a)," (which expired May 12, 1980). (Pl. Ex. 2, ¶ 6).

Upon execution of the agreement, Bookthrift paid Craftique $81,997.73 for all invoices outstanding. (Pl. Ex. 2, ¶ 9). Defendant performed under the compromise agreement of April 17, 1980 for several months during which time it shipped Bookthrift more than 200,000 copies of the Works, for which Bookthrift paid defendant more than $225,000. (Tr. 37–38, 110, 142). Thereafter, in early December 1980, defendant refused to ship any more books to plaintiff and began making plans to sell certain of the best sellers among the Works itself.

Performance under the April 17, 1980, agreement was far from smooth. Performance has been marked by disputes over billing, the placement of orders and the time within which orders were to be paid. The parties had met several times between April 17, 1980, and May 12, 1980, to negotiate with respect to market rights and the marketing of other products besides the

Works in the future but no agreement was reached. (Tr. 688–89).

Since November 10, 1978, the date plaintiff acquired Michael Shimkin's shares of Bookthrift, Inc., Mr. Shimkin has not been an officer, director or shareholder of plaintiff or any of its subsidiaries or divisions. (Tr. 289). From that date, with the exception of his having served as a consultant to Bookthrift until no later than about May, 1979 (Tr. 4–5), Mr. Shimkin has had no official connection with plaintiff or any of its subsidiaries or divisions. (Tr. 5, 91–92).

Defendant has claimed fraud and duress on the part of Shimkin but so far has failed to link Michael Shimkin to the negotiations held on April 17, 1980, which resulted in the written agreement. Neil Gerhardt, a defense witness, testified that Bookthrift purchased books from defendant in early 1980 pursuant to "good faith negotiations between Mike Shimkin and Bookthrift." (Tr. 772). Gerhardt also testified that neither Shimkin nor anyone else at Bookthrift was involved in any wrongdoing. *Id.*

Defendant attempts to characterize the April 17, 1980 agreement as the product of duress, arising from an alleged refusal by Bookthrift to pay approximately $81,000 owed to Craftique unless an agreement was reached. Defendant has failed to establish circumstances sufficient to explain why its representatives did not simply refuse to sign and then sue for the amount owed. Moreover, defendant has not alleged complicity or lack of authority on the part of its representatives at the April 17, 1980 meeting.

It is well settled that in order to obtain preliminary injunctive relief in this Circuit, a plaintiff must show:

"(a) irreparable harm and either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping toward the party requesting the preliminary relief.

*Jackson Dairy Inc. v. H. P. Hood & Sons,* 596 F.2d 70, 72 (2d Cir. 1979). For the reasons given below, this court concludes that plaintiff has established irreparable harm and a likelihood of success on the merits. Accordingly, a preliminary injunction will issue in the form described in the order filed simultaneously herewith.

## IRREPARABLE HARM

■ Plaintiff alleges breach of a contract entered into between it and defendant. Defendant responds by alleging fraud and coercion in the procurement of the contract at issue. Obviously, the classic remedy for breach of contract is an action at law for damages. If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable injury may be found as a matter of law. *Jackson Dairy, supra* at 72. At the same time, the Second Circuit has recognized that even in situations where damages are available, irreparable harm may be found if damages are "clearly difficult to assess and measure." *Danielson v. Local 275, Laborers International Union of North America,* 479 F.2d 1033, 1037 (2nd Cir. 1973). *See also Niagara Mohawk Power Corp. v. Graver Tank & Manufacturing Co.,* 470 F.Supp. 1308, 1327–28 (N.D.N.Y.1979); *Miller Brewing Co. v. Carling O'Keefe Breweries of Canada, Ltd.,* 452 F.Supp. 429, 438 (W.D.N.Y.1978). Based on the evidence presented to this point, the court is convinced that this case presents a situation where the damages flowing from the alleged breach would not be capable of reliable calculation.[2]

■ Only two methods of damage calculation appear to be available. The first

**2.** Defendant contends that plaintiff's action here is "basically one for lost profits." Defendant's Memorandum In Opposition to Plaintiff's Motion for a Preliminary Injunction at p. 10. Having thus characterized the action, defendant points to *Optivision, Inc. v. Syracuse Shopping Ctr. Assoc.,* 472 F.Supp. 665 (N.D.N.Y.

1979) (*Optivision*), as support for denial of injunctive relief in actions for lost profits where future sales may be estimated. This court certainly does not consider itself at odds with the District Court in *Optivision*. In fact, an injunction is being issued in this case precisely because future sales cannot be reliably calculated.

method, suggested by defendant in its memorandum in opposition to the instant application, is to extrapolate from plaintiff's previous sales of the Works. This method is unsatisfactory for a number of reasons. First, there is evidence in the record to indicate that the market for the books in question is highly volatile, and difficult to measure until actual marketing efforts are initiated. Second, sales of the books in question are, in part, dependent upon prior sales. In other words, a certain sales "momentum" develops which results in the sale of further books. This momentum has dissipated due to the lapse in plaintiff's marketing efforts occasioned by the lack of further supplies of the Works. Third, plaintiff has presented considerable testimony to the effect that marketing efforts at certain crucial periods in the preceding year, especially during the period when sales would have been made in expectation of the Christmas season, were curtailed due to plaintiff's concern over continued supplies of the books. This supply uncertainty prevented plaintiff from approaching a variety of large customers, in an effort to avoid entering into substantial commitments which plaintiff might not subsequently be able to fulfill. It appears that plaintiff sold a large number of these books in a relatively short period of time during 1980. Thus a number of variables would have to be taken into account before plaintiff's sales experience in 1980 could serve as the basis for an estimate of future sales.

On cross examination plaintiff's witnesses steadfastly refused to estimate how many sales of the Works were possible in the future. Plaintiff's counsel, at closing arguments on the instant application for preliminary relief, posited a potential sales range of anywhere between 200,000 and 1,000,000 copies of the Works. As the record currently stands, the court cannot honestly say that one of these figures is more plausible than the other. No surfeit of imagination is necessary to predict the situation this court will face if defendant's suggestion about an appropriate method for damage calculation is accepted. The prevailing party, whoever that might be, will suggest vast future sales based upon plaintiff's sales of almost 400,000 copies of the Works during a few months in 1980. The loser will strenuously object, pointing to the variety of reasons why plaintiff's 1980 sales are not necessarily reliable indicators of future sales.

Instead, as a second alternative, this court suggests that the only reliable method for determining how many of these books can be sold is to let someone go out and sell them. On its face, the contract at issue contemplates plaintiff as the seller. Currently, defendant seeks to market the books, claiming fraud and duress in the procurement of the contract which provides for sale of the books by plaintiff. However, the legal right to sell the books is a question going to the heart of the merits in this case. Likelihood of success on the merits will be discussed below. First the court must finally determine whether plaintiff has shown irreparable injury. If plaintiff's damages may be fairly calculated from defendant's sales, then plaintiff's damage action is an adequate remedy at law. If plaintiff has an adequate remedy at law, then it is not entitled to an injunction even if this court is convinced that plaintiff will ultimately prove it was illegally deprived of its right to sell the Works under the contract.

■ After carefully considering the evidence adduced thus far, this court concludes that plaintiff's damages may not fairly be calculated by reference to defendant's subsequent sales of the Works. This conclusion stems from a comparison of the sale's capabilities possessed by each company which could be brought to bear to sell the Works, the previous sales history of the Works, and the relative levels of expertise possessed by each party in connection with the type of books at issue. The legal conclusion concerning the appropriateness of using defendant's future sales as a damage measurement flows directly from the detailed factual determinations previously made.

## LIKELIHOOD OF SUCCESS ON THE MERITS

Defendant does not attempt to deny the existence of a written agreement. Nor

does defendant deny its repudiation of the agreement. In fact, its entire case is based upon an effort to prove that performance of the agreement as written endangers defendant's economic viability because the agreement was procured by fraud and duress.

■ Defendant's fraud defense depends entirely upon the alleged machinations of a Mr. Michael Shimkin. Apparently Mr. Shimkin was involved in the creation of both defendant, Craftique Productions, Inc. and Bookthrift, Inc. Bookthrift was then purchased by Simon & Schuster, a wholly-owned subsidiary of plaintiff. At the outset this court must articulate a basic problem with all of the evidence which defendant has put forward in support of its fraud claim. Defendant has failed to present any evidence directly linking Michael Shimkin to the agreement signed by its representatives on April 17, 1980. Defendant has described Mr. Shimkin's role in the founding of Craftique, and the creation of the initial arrangement between Craftique and Bookthrift. Those events may, in fact, have been fraudulent, but they are irrelevant to the defense which defendant now seeks to press in response to the instant breach of contract action.

According to defendant, after Shimkin helped to set up Craftique, he installed a close friend, Art Mills, as its president. Mr. Mills subsequently executed the April 17, 1980, agreement on behalf of defendant. In fact, the parties have informed this court that an action has been brought by defendant against Mr. Mills in the District of Connecticut in an effort to recover from him funds which defendant claims were defrauded by Mills while he served as president of Craftique. Yet defendant has failed to directly attack Mr. Mills' actions at the meeting of April 17, 1980. Defendant's witnesses included Mr. Neil Gerhardt, a certified public accountant who functioned as Craftique's outside accountant and business

adviser, and who was present at the April 17, 1980, meeting along with Mr. Mills. His testimony does not even suggest improper actions on the part of Mr. Mills. Gerhardt also admitted having no personal knowledge concerning any role which Michael Shimkin might have played in the negotiation of the April 17, 1980, agreement. Defendant persists in blaming its alleged economic woes on the activities of Michael Shimkin, but it has failed to link Shimkin to the agreement which forms the basis of this law suit.

Defendant's failure to link Shimkin to the April 17, 1980, agreement has procedural as well as substantive implications. Defendant's memorandum in opposition to the instant application admits that the burden of proving fraud in the procurement of a contract ordinarily rests on the party seeking recission. Defendant's Memorandum In Opposition at page 19. However, defendant points out that the doctrine of "constructive fraud" in New York law shifts the burden if a showing of undue influence is made. *See Gordon v. Bialystoker Ctr. & Bikur Cholim, Inc.*, 45 N.Y.2d 692, 412 N.Y. S.2d 593, 385 N.E.2d 285 (1978).[3] According to defendant, Shimkin's involvement in the negotiation of the April 17, 1980, agreement is sufficient to shift the burden to plaintiff to prove the absence of fraud. However, defendant has failed to link Shimkin with the April 17, 1980 agreement. This failure means defendant still bears the burden of proof on its fraud defense.

Defendant has not shown that it is likely to prove the existence of a fraud in the procurement of the April 17, 1980, agreement. The allegedly central actor in the fraud has not been linked with the agreement in question. The only other evidence pointed to by defendant in support of its fraud contention is the allegedly unfair price at which it was required to supply the Works to plaintiff. Defendant contends the contract price was below its own cost of production, thereby making it impossible for defendant to earn a profit. According

---

**3.** Paragraph 10 of the April 17, 1980, agreement provides for interpretation of the agreement "according to the laws of the state of New York." Both sides freely cite to New York precedent, and neither side has suggested the application of any jurisdiction's law other than New York's.

to defendant, such a favorable result could only have been achieved by improper behavior on plaintiff's part. Defendant introduced accounting reports and testimony of its independent accountant to support its characterization of the contract price as obviously unfair. The probative value of this evidence was severely undercut by a showing that it was derived from an initial printing for two of the Works in issue. Apparently the first printing of a book absorbs certain expenses which are not present in subsequent printings. In response, plaintiff introduced testimony that books similar to the Works were being produced for it by another supplier at prices lower than those which the agreement at issue set for books purchased from defendant. Admittedly the probative value of this testimony was in turn undercut by defendant, which pointed out that plaintiff's witness had not brought samples of the allegedly similar books to compare with the books in question. Finally, defendant's own witness, Mr. Gerhardt, testified that no effort was made by him or Mr. Mills to renegotiate the price suggested at the April 17, 1980 meeting, despite the fact that they were the same prices previously used. Defendant had experience with the prices it now complains of prior to the April 17, 1980 meeting. Given this prior experience, it cannot point to the price charged under the contract as proof of fraud without repudiating the actions of its representatives at the April 17, 1980 meeting. When all the evidence is compared, this court cannot say that the price agreed upon in the April 17, 1980 agreement appears obviously unfair.

In the alternative, defendant seeks to characterize the April 17, 1980 agreement as the product of duress. This duress results from the alleged refusal by plaintiff to pay approximately $81,000 owed to defendant on April 17, 1980 unless the April 17, 1980 agreement was executed. Again defendant admits that it would ordinarily have the burden of proving duress, but points to Mr. Shimkin's alleged involvement in an effort to shift the burden to plaintiff to demonstrate the absence of duress. For the reasons already given, this argument is rejected. Thus in attempting to decide whether plaintiff has established a likelihood of success on the merits, the court must take into account that defendant has the burden of proving economic duress.

 The elements of economic duress under New York law were succinctly laid out by Judge Knapp of this Court in *Business Incentives Co., Inc. v. Sony Corp. of America*, 397 F.Supp. 63, 96–70 (S.D.N.Y. 1975) (*Business Incentives*) (and cases cited therein). The party relying on the defense must show: (1) a threat, (2) which was unlawfully made, and (3) caused involuntary acceptance of contract terms, (4) because the circumstances permitted no other alternative. *Id.* For the purposes of deciding this motion, the court is willing to assume, although conflicting evidence exists, that a threat was made. However, even assuming such a threat was made, defendant has failed to make even a colorable argument that its acceptance of the April 17, 1980 agreement was the only available alternative. It is well settled New York law that a party may not prevail on an economic duress claim unless it can show that a breach of contract action would have been impossible when the threat was made. *See Austin Instrument, Inc. v. Loral Corp.*, 29 N.Y.2d 124, 130, 324 N.Y.S.2d 22, 25, 272 N.E.2d 533, 535 (1971).

 Defendant argues the $81,000 was crucially necessary to pay existing debts. However, in connection with the controversy over which party could most effectively market the books, defendant took great pains to identify itself as a mere extension of the Curtis Publishing Co. In turn, the president of Curtis Publishing testified at length concerning Curtis' status as an economically healthy enterprise. Moreover, in attempting to establish fraud, defendant tried at length to characterize the April 17, 1980 agreement as only a codification of terms which were already in effect, and which had already caused defendant significant financial harm. Now, when it is convenient to do so, defendant in effect argues that $81,000 was sufficiently crucial on April 17, 1980, to cause it to enter into an agreement which it already knew would cause it liability significantly in excess of the $81,000. Absent some repudiation of

the action taken by its representatives on April 17, 1980, defendant has offered no reasonable explanation why it did not simply sue on April 17, 1980. Defendant has consistently refused to attack the actions of its representatives on April 17, 1980, preferring instead to blame its current position on the activities of Michael Shimkin. On the record before this court, the entry into the agreement in issue, and the substantial subsequent performance rendered by defendant, seem almost certainly to be bad judgment. However, there is no evidence with which to label these actions as unavoidable. The record will not support a finding that plaintiff is not likely to succeed on the merits because defendant will prevail on its claim of economic duress.

### APPROPRIATE RELIEF

In the course of discussing the existence of irreparable harm, this court stated its reasons for concluding that plaintiff should be the party which markets the Works in question *pendente lite.* This leaves two other portions of the court's order, filed simultaneously herewith, which must be explained. First, since the order extends the life of certain contract provisions, *pendente lite,* those provisions may be extended past the point when each would naturally lapse under the agreement. The court feels that its authority in equity to take such action when necessary to prevent irreparable injury is on firm footing in this Circuit. *See McFarland v. Gregory,* 322 F.2d 737 (2nd Cir. 1973).

Second, although the court is convinced about which party should be selling the books in question, it is unsure which party should appropriately be charged with the manufacture of the Works. Obviously one of the basic purposes of a preliminary injunction is to maintain the *status quo. See Exxon Corp. v. City of New York,* 480 F.2d 460 (2d Cir. 1973). Here, the *status quo* at the time of the breach found defendant as producer of the Works. However, defendant has strenuously argued that it loses money on each copy of the Works which it is forced to sell at the prices provided in the April 17, 1980, agreement. An alternative is offered in the agreement itself, which provides for manufacture of the Works by Bookthrift with royalty payments to defendant in the event that the parties could not agree on a price for the Works after expiration of the period in which prices were set by the agreement. The period in which prices were set by the agreement has already expired, and the parties seem unlikely to reach an agreement at this point about how much the books should cost if produced by defendant. Accordingly this court has decided to provide an election to defendant. Defendant may decide whether it wishes to continue to supply the Works at the prices set in the April 17, 1980, agreement, or whether it is willing to provide plaintiff with the films necessary for plaintiff to manufacture the Works *pendente lite.* Of course the court's order provides that in the event defendant allows plaintiff to manufacture the Works, royalties should be paid to defendant as provided by the contract.

SO ORDERED.