**SASSON JEANS, INC., Plaintiff,**

v.

**SASSON JEANS, L.A., INC., Abraham Guez, Gerard Guez, No Jeans, a/k/a "No Sportswear" and "No Jeans, Inc., a division of Mamann Corporation, Inc." and Mamann Corporation, Inc., Defendants.**

**No. 86 Civ. 2506 (RWS).**

United States District Court, S.D. New York.

April 17, 1986.

David Breitbart, New York City, for plaintiff.

Townley & Updike, New York City, Rubin & Rahe, Beverly Hills, Cal., for defendants; Robert Lloyd Raskopf, New York City, S. Syd Rahe, Beverly Hills, Cal., of counsel.

SWEET, District Judge.

Plaintiff Sasson Jeans, Inc. ("SJI") brings this motion for a preliminary injunction pursuant to its complaint for federal trademark infringement under Sections 32(1) 15 U.S.C. § 1114(1), and 43(a), 15

U.S.C. § 1125(a) of the Trademark Act of 1946 ("Lanham Act"), infringement of New York State trademark registrations and dilution of trademark under New York General Business Law Sections 368–b and 368–d, and common law claims of unfair competition, breach of contract, inducing breach of contract, and interference with contractual relations. For the reasons set forth below, the motion for a preliminary injunction. is denied because SJI has failed to demonstrate the irreparable injury required for the granting of preliminary relief.

**Facts**

Family discord provides the backdrop for this trademark infringement and breach of contract action among brothers. SJI, a New York corporation, markets and licenses jeans and other apparel under the well-known "Sasson" trademark and "OK Design" (hereinafter the "Sasson trademark") under the direction of Paul Guez ("Paul"), SJI's president and sole shareholder. Defendant Sasson Jeans, L.A. ("SJLA") whose principal place of business is Los Angeles, California, is a corporation whose stock is wholly owned by Paul's brothers Hubert Abraham Guez ("Abraham") and Gerard Guez ("Gerard") who are the operating officers of SJLA.

On October 1, 1981, SJI granted SJLA an exclusive license to use the Sasson trademarks through September 30, 2053 in connection with the manufacture, sale and distribution of women's jeans and pants in the United States. This license agreement contained a written termination provision (Article VIII, ¶ 2) which entitled SJI to terminate the agreement by written notice in the event that SJLA violated the terms of the license. SJLA had seven days from the date of such written notice to cure the default at issue, or the license would be terminated.

On May 20, 1985, SJI notified SJLA in writing that the license agreement was terminated because of the deteriorating business and family relationship among the parties, and that SJLA was required to cease all use of the Sasson trademarks. However, SJI and SJLA reached an understanding as to how to dispose of the Sasson jeans already on hand in the United States and those on order from suppliers in Hong Kong and Indonesia. On August 13, 1985, SJI's general counsel Laurence Kahn ("Kahn") advised SJLA by letter that SJLA was no longer authorized to ship products bearing the Sasson trademarks without prior approval of Paul, and that any such use would be an infringement of SJI's trademarks and breach of contract. On August 15, 1985, Kahn sent another letter to SJLA detailing the specific arrangement to govern the jeans both on hand in the United States and those goods ordered from suppliers in the far east. The August 15, 1985 letter authorized SJLA to ship 420,000 units in SJLA's warehouse and 450,000 units "now on the dock—that is goods on hand in the United States only." Furthermore, SJI stated "Mr. Guez [Paul] will assist you in the sale of the goods in process. However, these goods may not be shipped without the express written approval of Mr. Guez. It is also imperative that you furnish us with a detailed accounting of all goods in process. In addition, any waiver of Royalties is only with respect to the 870,000 units in the United States."

The instant controversy centers around SJLA's alleged breach of the conditions contained in the August 15, 1985 letter agreement in connection with the sale of Sasson jeans to Trebor Sportswear Company, Inc. ("Trebor"). SJI alleges that Abraham and Gerard and SJLA, through their alter ego corporations, co-defendants "No Jeans" or "No Jeans, Inc." and their parent company "Mamann Corporation" conspired to infringe SJI's trademark and breached the August 15, 1985 agreement with the unauthorized sale of "goods in process" or Sasson Jeans not part of the 870,000 pairs in the United States.[1]

---

**1.** The affidavit of Claude Ravier ("Ravier"), vice-president of Mamann Corporation, doing business as "No Jeans," confirms that Gerard Guez, on behalf of SJLA, sold the Sasson jeans at issue to Mamann, which in turn sold the jeans to Trebor under the name "No Jeans." Despite Ravier's statement that neither Gerard nor Hubert Abraham Guez is an employee of Mamann, SJI has produced an internal computer printout

On February 11, 1986, Paul was informed by one of his salesmen that Trebor had purchased discounted Sasson jeans from Gerard through the "No Jeans" company. Paul sent two of his officers to the Trebor warehouse in Hackensack, New Jersey, where they discovered shipping cartons bearing the Sasson trademarks invoiced from No Jeans to Trebor. The packing slips for the cartons indicated that they contained ladies jeans and identified jeans of the following four Sasson style and cut numbers:

| Style | Cut |
|-------|-----|
| 14601 | J–7304 |
| 14694 | J–7307 |
| 30008N | J–8000 |
| 46435 | J–7312 |

The SJLA's computer inventory system indicates that all but one of the four styles of jeans were in the United States as of August 1, 1985, and therefore are part of the "goods on hand" which SJLA was entitled to ship pursuant to the August 15, 1985 letter. The bill of lading corresponding to Style 30008N, however, indicates that these jeans were in transit at the time of the August 15, 1985 letter, shipped from Indonesia on August 6, 1985 and arrived in the United States on August 27, 1985. The affidavit of Gary Bader ("Bader") former SJI president of sales offered by SJLA as proof of this approval, confirms that Bader took Gerard's word for Paul's approval of the sale, rather than waiting for written instructions as Paul had required. There was no prior authorization. SJI contends that the failure to obtain Paul's prior written permission for the sale of these jeans was both a breach of the terminated licensing agreement and the terms of the August 15, 1985 letter and constitutes an infringement of SJI's trademarks, as these jeans were not "goods on hand" either in an SJLA warehouse or on the docks as of August 15, 1985. SJI alleges further in oral argument that SJLA, Abraham and Gerard are flooding the market with discount jeans without obtaining prior written approval, using the alter ego corporations Mamann and No Jeans to surreptitiously avoid SJLA's sale restrictions, but no evidence to that effect has been submitted.

SJLA contends that jeans of style 30008N were not "goods in process" requiring written approval and an accounting for royalties because they were finished and shipped as of August 6, 1985, and were in transit to the United States. Furthermore, SJLA contends that it had the prior approval of SJI to ship the jeans to Trebor.

**Law**

In order to obtain a preliminary injunction in the trademark infringement and unfair competition context, SJI must meet the Second Circuit's standard for injunctive relief:

> A party seeking a preliminary injunction in this Circuit must establish both possible irreparable injury and either (1) a likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly in the movant's favor.

*Le Sportsac, Inc. v. K Mart Corp.*, 754 F.2d 71, 74 (2d Cir.1985); *Standard and Poor's Corp., Inc. v. Commodity Exchange, Inc.*, 683 F.2d 704 (2d Cir.1982).

**Irreparable Injury**

**Consumer Confusion**

■ A claim of trademark infringement based upon both §§ 32(1) and 43(a) of the Lanham Act, 15 U.S.C. § 1114(1), and 1125(a) is premised upon the allegation that the public is confused as to the source of the goods in question. *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, supra, 683 F.2d at 708. As the Second Circuit has stated:

> A cause of action for trademark infringement exists ... where an individual uses a trademark (1) without consent (2) in connection with the sale of goods, (3) where such use is likely to cause confusion or to deceive purchasers as to the source or the origin of the goods.

*Franchised Stores of New York, Inc. v. Winter*, 394 F.2d 664, 668 (2d Cir.1968).

of the Mamann employee roster which shows    both as employees of the company.

This "confusion" test for trademark infringement governs both the federal trademark infringement claims and New York Business Law trademark infringement and unfair competition claims. *Blake Publishing Corp. v. O'Quinn Studios, Inc.*, 202 U.S.P.Q. 848, 852, (S.D.N.Y.1979); *Maternally Yours, Inc. v. Your Maternity Shop, Inc.*, 234 F.2d 538, 544 (2d Cir.1956) and the existence of this confusion constitutes a showing of irreparable harm in the injunction context. *Plus Products v. Plus Discount Foods, Inc.*, 722 F.2d 999, 100 (2d Cir.1983); *Standard & Poor's Corp. v. Commodity Exchange, Inc., supra,* 683 F.2d at 708.

SJI contends that SJLA's unauthorized sale of jeans without prior written approval demonstrates that SJI will be irreparably injured if SJLA is not enjoined from undercutting SJI on its own trademark goods. SJI believes that consumer confusion will result from SJLA's unauthorized sales, as purchasers such as Trebor would falsely believe that the goods purchased from SJLA are manufactured by SJI or exist under its sponsorship. In certain circumstances an ex-licensees' continued unauthorized use of a trademark is presumed to cause the type of consumer confusion discussed above, *see Bowmar Instrument Corp. v. Continental Microsystems, Inc.,* 497 F.Supp. 947, 957 (S.D.N.Y.1980), and licensor's can obtain injunctive relief to prevent ex-licensees from continuing to use the plaintiff's trademarks, however, these cases involve the defendants unauthorized use of these trademarks on goods. *See id.* (ex licensee uses plaintiff's trademark on unauthorized products); *Burberry's (Wholesale) Limited v. After Six, Inc.,* 471 N.Y.S.2d 235, 237, 122 Misc.2d 561 (N.Y. Sup.Ct.1984) (continued use of trademark after licensor prohibits continued manufacture or sale would cause confusion irreparable harm). Here, however, the peculiarities of the August 15, 1985 agreement and the proof submitted to date render this claim inappropriate.

■ It is undisputed that the August 15, 1985 letter authorizes SJLA to complete and affix the Sasson trademarks to the approximately one million pieces which Paul Guez estimates were on order from foreign suppliers. Therefore, the Sasson jeans at issue are "genuine" goods, and SJI may complain only of their sale and not their existence. Under these circumstances, the courts of this circuit have held that the unauthorized sale of authorized goods does not give rise to a claim for trademark infringement. *El Greco Leather Products Co. v. Shoe World, Inc.,* 599 F.Supp. 1380 (E.D.N.Y.1984); *Diamond Supply Co. v. Prudential Paper Products Co., Inc.,* 589 F.Supp. 470 (S.D.N.Y.1984). *See also DEP Corp. v. Interstate Cigar Co.,* 622 F.2d 621, 622 n. 1 (2d Cir.1980). The Ninth Circuit's analysis in *Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.,* 707 F.2d 1054 (9th Cir.1983) is particularly helpful in this regard. In *Monte Carlo* the plaintiff sued defendant for purchasing and selling shirts manufactured for plaintiff which had been rejected because of late delivery. The Court stated in granting summary judgment for defendants:

> The goods sold by Daewoo were not imitations of Monte Carlo shirts, they were the genuine product, planned and sponsored by Monte Carlo and produced for it on contract for future sale. The shirts were not altered or changed from the date of their sale. Their source was Monte Carlo; the absence of Monte Carlo's authorization of the discount retailers to sell does not alter this.

*Id.* at 1058.

■ SJI previously authorized the manufacture of the Sasson jeans at issue and the affixation of the Sasson trademarks. Assuming, *arguendo,* that these jeans constitute part of the "goods in process" as SJI contends, the only condition of their sale was prior written approval of Paul Guez, an accounting of the goods, and the payment of royalties. These jeans were manufactured under the sponsorship of SJI and the trademark application was sanctioned by SJI. While irreparable injury is usually presumed to exist in instances of trademark infringement and unfair competition, *Joseph Scott Co. v. Scott Swimming Pools, Inc.,* 764 F.2d 62 (2d Cir.1985), the

presumption fails where the element of consumer confusion is absent as a matter of fact.

■ In its reply memorandum of law, SJI attempts to avoid the application of the *El Greco* doctrine in two ways. First, SJI adopts SJLA's argument that the goods "in transit" were neither "goods on hand" nor "goods in process" under the August 15, 1985 agreement so that SJI never gave authority for the Sasson trademarks to be affixed to style 30008N, depriving them of the status of "genuine goods" under *El Greco*. As will be discussed *infra*, this argument creates a third category of goods where the language of the agreement evidences only two. Furthermore, the notion that the August 15, 1985 letter was meant to exclude a small unmentioned portion of goods on their way to the United States, while explicitly approving of the continued production of ordered goods to be shipped at a later date distorts the purpose of the August 15, 1985 letter, which was to assist SJLA to dispose of the Sasson jeans which had been ordered prior to the license termination. (Affidavit of Paul Guez ¶ 20–21).

Similarly unpersuasive is SJI's statement that goods manufactured after May 20, 1985 cannot be "genuine" goods under the *El Greco* standard, as they were manufactured after licensing agreements had expired. This argument conveniently puts aside the August 15, 1985 agreement which explicitly permits SJLA to continue to use the Sasson trademarks on goods "on hand" in the United States or "goods in process" in Indonesia and Hong Kong, in effect extending the licensing agreement under the strictly controlled conditions therein. The existence of this authorization to affix the Sasson trademarks also distinguishes the facts here from those in *Bill Blass, Ltd. v. SAZ Corp.*, 751 F.2d 152 (3d Cir.1984). In *Bill Blass*, the court preliminarily enjoined an ex-licensee from continuing to sell coats with plaintiff's label, even though the goods had been authorized by the plaintiff but sold after the licenses had expired. Contrary to the case at bar, however, the defendants in *Bill Blass* were selling coats under plaintiff's label after the express and implied inventory liquidation periods had lapsed, whereas SJLA, under the August 15, 1985 agreement, had continuing authority from SJI to affix the Sasson trademarks and sell the jeans under the conditions outlined in the letter agreement. It is the existence of this continuing imprimatur from SJI which renders the goods "genuine" under the *El Greco* standards. SJI has therefore failed to demonstrate irreparable injury stemming from consumer confusion about the source of the Sasson jeans sold to Trebor.[2]

### Breach of Contract

■ SJI also claims that SJLA's breach of contract, the unauthorized sale of style 30008N to Trebor, evidences the irreparable injury necessary to satisfy this Circuit's test for injunctive relief. On the facts as found by the court SJLA was required to obtain prior written permission from Paul Guez before selling style 30008N to Trebor, and was required to pay royalties and furnish an accounting for these goods. Contrary to SJLA's assertion, the August 15, 1985 letter gives no evidence of the existence of a third category of goods—a category of goods "in transit" at the date of the letter. Instead, the language permits SJLA to ship or sell the 870,000 units in the warehouse and on the dock—"that is goods on hand in the United States only." It is the presence of goods in the United States at the time of the letter which divides "goods on hand" from "goods in process," and not a superimposed notion of "goods in transit"—a concept which only has a place in the letter if the meaning "goods in pro-

---

**2.** SJI's claim premised on New York's anti-dilution statute, New York General Business Law § 368–d (McKinney 1984) is not dependent on a showing of consumer confusion, but rather is proved by the existence of (1) a strong distinctive mark and (2) a likelihood of dilution. *Miss Universe, Inc. v. Patricelli*, 753 F.2d 235, 238 (2d Cir.1985). The fact that the jeans at issue here are "genuine" Sasson jeans deprives SJI of the ability to claim that SJLA is "whittling down" the identity or reputation of the trademark. *See Sally Gee, Inc. v. Myra Hogan, Inc.*, 699 F.2d 621, 625 (2d Cir.1983).

cess" is limited to goods not completed and still held at the factory.

Furthermore, reading the letter to create a category of "goods in transit" would require an elaborate monitoring of shipping dates and manufacture completion dates which finds no support or reference in the letter. SJLA's reading of the August 15 settlement seeks to replace a bright-line geographical division ("any waiver of Royalties is only with respect to the 870,000 units in the United States) with an ambiguous test of completion dates in order to avoid its responsibility for selling style 30008N to Trebor without prior written authorization. As SJLA has conceded in its opposition papers, this finding obligates SJLA, Mamann or No Jeans to pay the appropriate royalties to SJI and to furnish the detailed accounting required by the August 15, 1985 letter.

A preliminary finding of breach of contract does not, however, establish that SJI has shown the irreparable injury prerequisite for injunctive relief. In order to obtain injunctive relief for irreparable injury flowing from a breach of contract, SJI must show that it cannot be compensated by a subsequent award of money damages. As the court stated in *Gulf & Western Corp. v. Craftique Products, Inc.*, 523 F.Supp. 603, 607 (S.D.N.Y.1981), a case of copyright infringement and breach of contract by an ex-licensee, "obviously, the classic remedy for a breach of contract is an action at law for damages. If the injury complained of may be compensated by an award of monetary damages, then an adequate remedy at law exists and no irreparable injury may be found as a matter of law. At the same time, the Second Circuit has realized that even in situations where damages are available, irreparable harm may be found if damages are 'clearly difficult to assess and measure'." (citations omitted)

Although SJI attempts to link the harm produced by the contract breach with the alleged injury to the value of the Sasson trademarks resulting from the claimed infringement, SJI has offered no evidence from which this court can conclude that the damages from unauthorized sales defy reliable calculation. Indeed, the August 15, 1985 letter agreement requires SJLA to provide SJI with a detailed accounting of the inventory and was to pay royalties based on this accounting. The subsequent breach of the duty to obtain written approval prior to sale of the jeans does not render the damages from this royalty arrangement incalculable. This situation is in contrast to the cases relied upon by SJI in which irreparable injury or incalculability was found because of the breach of a license agreement. For example, in *Gulf and Western Corp. v. Craftique Productions, supra*, 523 F.Supp. 603, 608, the court found irreparable injury from the breach of a exclusive book sale contract because it was impossible to calculate plaintiff's future sales of books. Similarly in *Drukill Co. v. Alpha Alpina, S.A.*, 223 N.Y.S.2d 51 (N.Y.Sup.1961), the court restrained defendant's release of a motion picture prior to the agreed upon release date because it would compete with the simultaneous tour of the stage production with no way to measure the resultant monetary losses to the plaintiff.[3] In short, SJI has not to date demonstrated the incalculability of these breach of contract damages apart from the confusion claim rejected above, and has not met its burden of demonstrating irreparable injury. *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983) (a showing of irreparable injury is perhaps the single most important prerequisite for the issuance of a preliminary injunction).

SJI's motion for a preliminary injunction is denied on this record, but expedited discovery is granted and further evidence may be developed on the irreparability of SJI's

3. Injunctive relief was granted in *Coit Drapery Cleaners v. Coit Drapery Cleaners of New York*, 423 F.Supp. 975 (E.D.N.Y.1976) and *Baskin-Robbins Ice Cream v. D & L Ice Cream Co., Inc.*, 576 F.Supp. 1055 (E.D.N.Y.1983) because defendants were infringing on plaintiff's trademarks by continuing to hold themselves out to the public as franchisees after the termination of the licensing agreements, and not as a result of a breach of contract accompanied by incalculable damages.

damage and any market flooding without obtaining prior written permission of Paul Guez and without supplying the accounting demanded by the August 15, 1985 letter. Although it is not necessary to do so, leave to renew the motion under such circumstances is hereby granted, and defendants' April 14, 1986 request for an extension of time to move or answer the complaint is granted until May 2, 1986.

IT IS SO ORDERED.