**W. GOEBEL PORZELLANFABRIK,**
Plaintiff,

v.

**ACTION INDUSTRIES, INC., Defendant.**

**No. 83 Civ. 8490 (GLG).**

United States District Court,
S.D. New York.

July 19, 1984.

**764**

Brumbaugh, Graves, Donohue & Raymond by Granville M. Brumbaugh, Sr., Richard G. Fuller, Jr., Robert Neuner, Parker H. Bagley, New York City, and Davis, Polk & Wardwell, New York City, for plaintiff; Bartlett H. McGuire, New York City, of counsel.

Titus, Marcus & Shapira by Paul H. Titus, Pittsburgh, Pa., and Nims, Howes, Collison & Isner, New York City, for defendant/counterclaimant; Kenneth R. Umans, New York City, of counsel.

## OPINION

GOETTEL, District Judge:

Before the Court is a motion by plaintiff W. Goebel Porzellanfabrik ("Goebel") to dismiss the antitrust counterclaims brought by defendant Action Industries, Inc. ("AII"), in response to Goebel's complaint charging AII with copyright infringement. AII charges that Goebel's business practices restrained trade in violation of the antitrust laws, that the infringe-

ment suit itself was part of the antitrust conspiracy, and that Goebel obtained its copyrights by fraud. Goebel moves to dismiss the counterclaims under Fed.R.Civ.P. 12(b)(6) asserting, *inter alia,* that AII has no standing to bring the antitrust claims and so fails to state a claim for which relief can be granted. For the reasons outlined below, the Court grants Goebel's motion to dismiss.

## BACKGROUND

Goebel is a West German limited partnership based in Bavaria which manufactures a variety of figurines, plaques, plates, bells, and dolls based on the sketches and drawings of Sister M. Innocentia Hummel (known as "Hummel figures"). Goebel makes the Hummel figures under a license from the Congregation of the School Sisterhood of the Third Order of St. Frances at the Convent of Seissen, of which Sister Hummel was a member until her death in 1946. The convent exercises artistic supervision over the goods produced by Goebel, which holds a number of United States copyrights on the Hummel figures it makes. These figures are imported into the United States by three authorized wholesalers who distribute them to retailers nationwide.

Goebel's complaint alleges that for the past three years, AII has acquired Hummel figures from authorized vendors in Europe and has imported them into this country, thus by-passing Goebel's authorized distributors.[1] Goebel's complaint asserts that AII's importation of these Hummel figures violates those provisions of the copyright laws which prohibit the unauthorized distribution or importation of copyrighted goods. 17 U.S.C. §§ 106 and 602(a) (1982).[2] Goe-

---

**1.** AII operates in what has become known as the "gray market," in which legitimately produced goods are imported without the authorization of the trademark or copyright holder. A gray market is created when an arbitrageur takes advantage of a price difference between two markets by buying in the market where prices are lower and selling in the market where prices are higher. The Hummel figures at issue here are genuine items produced by Goebel; what Goebel seeks to challenge is AII's unauthorized importation of them into the country.

**2.** Section 106 provides, in pertinent part, that "the owner of a copyright under this title has the exclusive right to do and to authorize any of the following:

. . . .

"(3) to distribute copies ... of the copyrighted work to the public by sale or other transfer of ownership...." 17 U.S.C. § 106 (1982).

Section 602(a) provides: "Importation into the United States, without the authority of the owner of the copyright under this title, of copies ... of a work that have been acquired outside

bel also charges that this unauthorized importation of Hummel figures constitutes a tortious interference with its exclusive contracts with its United States distributors. Goebel seeks an injunction barring AII from infringing its copyrights by importing the Hummel figures and from interfering with its contracts with its American distributors, and an accounting of the profits that AII earned as a result of its sales of Hummel figures.

In its answer, AII raises several affirmative defenses, including that the Hummel figures are not new and original works and so should not be afforded protection under the copyright laws. AII also counterclaims for $5 million in damages ($15 million, if trebled) under sections 1 and 2 of the Sherman Anti-Trust Act, 15 U.S.C. §§ 1 and 2 (1982), and under the Wilson Tariff Act, 15 U.S.C. § 8 (1982), which prohibits restraints of trade involving imported goods. It is these antitrust claims that are the subject of the instant motion.

The thrust of AII's antitrust counterclaims is that Goebel is using its copyrights to limit the quantity of Hummel figures being imported into this country, thereby keeping prices artifically high and that this amounts to misuse of the copyright which would strip Goebel of the immunity from antitrust protection normally extended by the copyright laws. AII additionally charges that Goebel (or its American distributors, the counterclaim fails to specify which) engaged in a number of other anticompetitive practices such as requiring retailers to sell at or above published list prices; requiring retailers to purchase non-copyrighted goods in order to get copyrighted goods; requiring retailers to carry slow-moving items in order to get fast-selling ones; and prohibiting retailers who purchased Hummel figures from re-selling the merchandise to other retailers.

## DISCUSSION

### A. AII's Lack of Standing Bars Its Antitrust Counterclaims

■ In considering this litany of antitrust claims, the Court finds one fact to be inescapable: AII fails to allege that it has suffered any injury as a result of any of these practices. As a consequence, AII lacks standing to prosecute these counterclaims.[3] As the Supreme Court has explained: "Plaintiffs must prove *antitrust injury*, which is to say injury of the type the antitrust laws were intended to prevent and that flows from that which makes defendants' acts unlawful. The injury should reflect the anticompetitive effect either of the violation or of anticompetitive acts made possible by the violation." *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 489, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (original emphasis). The plaintiff must show more than a mere violation of the antitrust laws, he must also show an injury that is a direct result of the anticompetitive behavior of the defendant. *Id.*

Even before the *Brunswick* decision, the Second Circuit had "committed itself" to the principle that before a plaintiff could make out a claim for antitrust injury, he "must be within the 'target area' of the alleged conspiracy, i.e., a person against whom the conspiracy was aimed, such as a competitor of the persons sued." *Calderone Enterprises Corp. v. United Artists Theater Circuit, Inc.*, 454 F.2d 1292, 1295 (2d Cir.1971), *cert. denied*, 406 U.S. 930, 92

the United States is an infringement of the exclusive right to distribute copies ... under section 106...." 17 U.S.C. § 602(a) (1982).

**3.** On the question of which plaintiffs have standing to bring antitrust suits, Professors Areeda and Turner have written:

In an effort to cope with the infinite numbers of possible plaintiffs the courts have required (1) that the plaintiffs be injured in fact, (2) that the injury be to his "business or property," (3) that the injury be of the type the

antitrust laws were intended to prevent, (4) that there be significant causal connection between the defendant's violation and the plaintiff's injury, and (5) that the injury flow from that which makes the defendant's acts unlawful.

P. Areeda and D. Turner, II *Antitrust Law* ¶ 334a (1978). As is demonstrated below, AII fails to show that it suffered any injury, much less an injury of the sort the antitrust laws were intended to prevent.

S.Ct. 1776, 32 L.Ed.2d 132 (1972). In *Calderone*, the court held that the landlord of a motion picture theater was not within the "target area" of the antitrust laws, and so did not have standing to bring suit against motion picture distributors, because all that was alleged was that the distributors had conspired with the tenant operator of the theater to book less popular films for the theater. The court reached this conclusion despite the fact that the lease between the plaintiff landlord and the tenant provided for nominal rentals plus a share of the revenues from the theater's ticket sales. *Id.* at 1294.

The *Calderone* court also noted that in the past, a patent owner was found to lack standing to sue for damages to its licensee, *Productive Inventions, Inc. v. Trico Products Corp.*, 224 F.2d 678 (2d Cir.1955), *cert. denied*, 350 U.S. 936, 76 S.Ct. 301, 100 L.Ed. 818 (1956), and that a franchisor lacked standing to bring suit for damages resulting from an antitrust conspiracy aimed at its franchisee, *Billy Baxter, Inc. v. Coca-Cola Co.*, 431 F.2d 183 (2d Cir.), *cert. denied*, 401 U.S. 923, 91 S.Ct. 877, 27 L.Ed.2d 826 (1971). *Calderone Enterprises Corp. v. United Artists Theater Circuit, supra*, 454 F.2d at 1295.

In those three cases, the plaintiff arguably suffered some loss, though the loss was indirect, flowing from a direct injury suffered by a tenant, licensee, or franchisee. AII, however, is in a much weaker position because it cannot even point to an indirect loss; none of the allegedly anticompetitive practices engaged in by Goebel were aimed at AII itself, or anyone in privity with AII. If anyone at all was affected by the alleged practices, it was the retailers who purchased the Hummel figures for resale and the consumers who ultimately purchased them.

Indeed, AII may actually have been benefited by Goebel's allegedly restrictive trade practices. Assuming that all of the facts in AII's counterclaim are true, the prices of Hummel figures were artificially inflated to the point where it was possible for AII to purchase the figures in Europe, ship them to the United States and, even after paying the freight costs, still undersell the authorized Goebel distributors and make a profit. Thus, in the absence of the complained of practices, AII would never even have had the financial attraction to import the Hummel figures.

AII does not even allege that Goebel refused to deal with it, which Goebel would, in any event, be free to do. The Supreme Court recently affirmed the right of a manufacturer to refuse to do business with those who decline to comply with the manufacturer's conditions as long as there is no conspiracy between the manufacturer and other competing retailers to cut off any non-complying retailers. *Monsanto Co. v. Spray-Rite Service Corp.*, —— U.S. ——, ——, 104 S.Ct. 1464, 1469, 79 L.Ed.2d 775 (1984). *See* Note, *Oligopolistic Interdependence: The FTC Adopts a "No Agreement" Standard to Attack Parallel Non-Collusive Practices*, 50 Brooklyn L.Rev. 255, 265–66 & n. 59 (1984) (decisions not to deal, in the absence of some concrete showing of agreement, cannot be attacked under the antitrust laws).

AII does claim that it suffered a direct loss because, after the filing of Goebel's suit, it was "forced" to stop importing the Hummel figures it had already purchased in Europe and thereby incurred storage and other costs. If this is true, the Court notes that this injury is strictly self-inflicted. The decision to stop importing Hummel figures was not made in response to a court order, but was instead a unilateral decision on the part of AII. By no stretch of the imagination can Goebel be held liable for any loss that AII incurred as a result of its decision to cease imports.

For these reasons, the Court finds that AII lacks standing to bring suit for damages resulting from any anticompetitive trade practices that may have been engaged in by Goebel.

**B.** *The Lawsuit Itself Cannot Be Treated As An Anticompetitive Act*

■ AII also claims that the mere institution of the lawsuit by Goebel was itself

an act in furtherance of the antitrust conspiracy. Aside from the fact that AII has no standing to challenge Goebel's trade practices, the Court notes that lawsuits have only rarely been treated as part of an antitrust conspiracy. Where the holder of a valid copyright brings suit in good faith and based on reasonable grounds, "[w]hatever other anticompetitive activity the [copyright holder] may be guilty of, the [copyright laws] would seem to authorize him to bring such a non-frivolous suit." *Ansul Co. v. Uniroyal, Inc.*, 448 F.2d 872, 882 (2d Cir.1971), *cert. denied*, 404 U.S. 1018, 92 S.Ct. 680, 30 L.Ed.2d 666 (1972). *See also Rex Chainbelt, Inc. v. Harco Products, Inc.*, 512 F.2d 993 (9th Cir.), *cert. denied*, 423 U.S. 831, 96 S.Ct. 52, 46 L.Ed.2d 49 (1975); *Sulmeyer v. Seven-Up Co.*, 411 F.Supp. 635 (S.D.N.Y.1976).

In *Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc.*, 674 F.2d 1252 (9th Cir.1982), *modified*, 690 F.2d 1240, *cert. denied*, 459 U.S. 1227, 103 S.Ct. 1234, 75 L.Ed.2d 468 (1983), the court explained that the seeking of governmental action, whether legislative, judicial, or administrative, is immune from antitrust strictures under the *Noerr-Pennington* Doctrine, absent a showing that the action is sought without probable cause, or is instituted in bad faith. *Id.* at 1262–63.

Here, AII fails to make any showing that there was bad faith behind Goebel's commencement of the instant suit, or that there was any intent to harrass. Given the direct language of section 602 of the copyright laws, *see supra* note 2, AII's claim that Goebel's suit was part of an antitrust conspiracy must also be dismissed.

## C. Goebel Did Not Obtain Its Copyrights By Fraud

■ In another part of its counterclaim, AII alleges that Goebel obtained its copyright by perpetrating a fraud on the copyright office. The gist of this allegation is that the three-dimensional Hummel figures are based on the two dimensional drawings by Sister Hummel and that there may be some doubt as to the true ownership of her drawings. Because Goebel's Hummel figures are based on these drawings, AII's argument continues, there must also be some doubt as to the validity of Goebel's copyrights on the three-dimensional figures.

In pressing these arguments, AII ignores one of the basic principles of copyright law—that derivative works can be copyrighted and that such works and their copyrights exist independently of the original works and whatever copyrights may protect them. 17 U.S.C. § 103(a) (1982) (derivative works may be copyrighted). For example, under the predecessor to this section, the Second Circuit held that a collection of mezzotints of art works which were in the public domain could be copyrighted. *Alfred Bell & Co. v. Catalda Fine Arts, Inc.*, 191 F.2d 99, 104 (2d Cir.1951).[4]

Here, there is no question that the Hummel figures are derivative of the works of Sister Hummel, so the Court need not concern itself with the confused (and confusing) affidavit submitted in opposition to Goebel's motion to dismiss, which attempts to imply that there may be some doubts as to the true ownership of Sister Hummel's drawings. Even if the allegations in that affidavit were true, the artists in the employ of Goebel who translated the sketches into three-dimensional art works have added sufficient creative effort to make the Hummel figures protectible under the copyright laws. Therefore, as a matter of law, Goebel perpetrated no fraud on the copyright office by applying for copyrights on its Hummel figures.

## CONCLUSION

For the reasons outlined above, AII lacks standing to bring its claims of antitrust violations against Goebel; therefore, Goebel's motion to dismiss those counterclaims must be, and hereby is, granted.

SO ORDERED.

---

**4.** Similarly, at oral argument, counsel for Goebel quite properly noted that a film based on a novel was copyrightable on its own.