**ORIGINAL APPALACHIAN ARTWORKS, INC.,**
Appellee,

v.

**GRANADA ELECTRONICS, INC., Appellant.**

**No. 519, Docket 86–7670.**

United States Court of Appeals, Second Circuit.

Argued Dec. 8, 1986.

Decided April 7, 1987.

---

Noel W. Hauser, Haas, Greenstein, Hauser, Sims, Cohen & Gerstein, P.C., New York City, for appellant.

Gerard F. Dunne, Wyatt, Gerber, Shoup, Scobey & Badie, New York City (Bruce N. Proctor, Eliot S. Gerber, New York City; William H. Needle, Atlanta, Ga.; Stanley F. Birch, Jr., Atlanta, Ga., of counsel), for appellee.

Before OAKES, CARDAMONE and WINTER, Circuit Judges.

OAKES, Circuit Judge:

This appeal involves a suit by a registered trademark owner in the United States against the importer of so-called "gray goods," here Cabbage Patch Kids dolls, bearing the owner's trademark but manufactured abroad under a restrictive license from the trademark owner. The license restriction defined the territory in which the dolls could be sold, limiting sales essentially to Spain. The Spanish "Kids," although duly bearing the appropriate trademark, nevertheless differ from Kids manufactured in the United States because their "adoption papers" are in Spanish. The United States District Court for the Southern District of New York, William C. Conner, Judge, found that sale of the Spanish dolls in the United States infringed the owner's trademark and granted a permanent injunction against the importer and distributor of the dolls. *Original Appalachian Artworks, Inc. v. Granada Electronics, Inc.*, 640 F.Supp. 928 (S.D.N.Y. 1986). We affirm.

This action was brought by Original Appalachian Artworks, Inc. (OAA), the Georgia maker and licensor of the well-known Cabbage Patch Kids dolls, against Granada Electronics, Inc. (Granada), who imported and distributed Cabbage Patch Kids dolls in the United States. Granada's dolls were made in Spain by Jesmar, S.A. (Jesmar), under a license from OAA (through a licensing agent) which permitted manufacture and distribution of the dolls in Spain, the Canary Islands, Andorra, and Ceuta Melilla. Under the license Jesmar agreed not to make, sell, or authorize any sale of the licensed products outside its licensed territory and to sell only to those purchasers who would agree not to use or resell the licensed products outside the licensed territory. The boxes containing the Jesmar dolls bear the "Cabbage Patch Kids" trademark displayed in English on all panels of the box except the bottom. Also printed in English are the words "The World Of" preceding the trademark on the rear panel of the box and the name of OAA and its United States address in small print in the copyright notice. The rest of the wording on the box, however, is in Spanish.

OAA makes hand-sewn soft-sculpture Cabbage Patch Kids dolls in Cleveland, Georgia, and markets them through what it calls "adoption centers" located primarily in specialty stores and finer department stores. Purchasers of the dolls receive "birth certificates" and "adoption papers" to be filled out by the "parent" or owner of the doll, who takes an "oath of adoption." The adoption papers are returned to OAA, and the information is entered into the OAA computer so that on the first anniversary of the adoption the adopting parent receives a "birthday card" from OAA. Judge Conner found that this adoption process is an "important element of the mystique of the [Cabbage Patch Kids] dolls, which has substantially contributed to their enormous popularity and commercial success." 640 F.Supp. at 930.

Through an intermediary licensing agent, OAA also licenses Coleco Industries, Inc., of Hartford, Connecticut, to manufacture, promote, and distribute Cabbage Patch Kids dolls within the United States. Unlike the OAA dolls, the Coleco dolls are smaller, with vinyl heads. They are mass-produced, packaged in boxes, and sold at a retail price less than half that of the OAA soft-sculpture dolls. Nevertheless, the Coleco dolls are also accompanied by birth certificates and adoption papers and by English-language instructions suggesting the return of completed adoption papers in a preaddressed envelope to a processing center in the United States. The instructions also permit a purchaser "legally" to change the name of the doll if desired, and the doll's

parent gets a suitable-for-framing birth certificate as well as a birthday card on the first birthday of the doll. Coleco, with tremendous sales, has invested millions of dollars in advertising the dolls during the last three years and had spent approximately $2.9 million in the first two quarters of 1986. The district court found that, indeed, the Cabbage Patch Kids trademark has become famous and associated with Coleco by virtue of its advertising expenditures and television commercials. 640 F.Supp. at 931.

We note that OAA did cause its trademark to be recorded with the United States Customs Service, the regulations of which require the listing "of each foreign person or business entity authorized or licensed to use the trademark and a statement as to the use authorized." 19 C.F.R. § 133.2(c) (1986). Jesmar was listed on the application for recordation by OAA and pursuant thereto the Customs Service sent its agents a letter authorizing Cabbage Patch Kids dolls made by Jesmar to pass through Customs. Parenthetically it should be noted that this court recently held that these regulations were not contrary to statute and that the Customs Service as a matter of "enforcement discretion" and by virtue of inherent "administrative difficulties" may authorize the admission of so-called gray market goods. *Olympus Corp. v. United States*, 792 F.2d 315, 320 (2d Cir.1986), *petition for cert. filed*, 55 U.S.L.W. 3372 (U.S. Nov. 6, 1986) (No. 86–757); *accord Vivitar Corp. v. United States*, 761 F.2d 1552, 1569–70 (Fed. Cir.1985), *cert. denied*, —— U.S. ——, 106 S.Ct. 791, 88 L.Ed.2d 769 (1986). *But see Coalition to Preserve the Integrity of American Trademarks v. United States*, 790 F.2d 903, 916–17 (D.C.Cir.1986) (customs regulations allowing importation of gray goods inconsistent with statute governing entry of trademarked goods), *cert. granted*, —— U.S. ——, 107 S.Ct. 642, 93 L.Ed.2d 699 (1986). It is important to point out, however, that although we held in *Olympus* that Customs could permit entry of gray market goods, we also indicated that this does not limit the reach of protection of section 526 of the Tariff Act of

1922, as reenacted in 1930 and codified at 19 U.S.C. § 1526 (1982). As we stated, "The markholder still has rights under the statute: he may pursue private remedies against the importer under section 526(c), notwithstanding Customs' failure to exclude the goods." *Olympus Corp.*, 792 F.2d at 320. This is precisely such a case, that is, one in which the markholder is pursuing its private remedies against the importer. *Cf. Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163 (S.D.N.Y.1984) (granting preliminary injunction in private infringement action against the importation of goods genuinely marked abroad), *cited with approval and disapproval in Olympus Corp.*, 792 F.2d at 319.

## DISCUSSION

As Judge Conner noted below, 640 F.Supp. at 932, OAA's registration of the Cabbage Patch Kids trademark is prima facie evidence of its validity and of OAA's exclusive right to use the trademark, the validity of which has not been challenged here. As he also noted, section 32 of the Lanham Trademark Act of 1946, 15 U.S.C. § 1114(1)(a) (1982), prohibits the unauthorized sale of goods bearing a registered trademark where there is a likelihood of confusion, mistake, or deception of purchasers. *See, e.g., Syntex Laboratories, Inc. v. Norwich Pharmacal Co.*, 437 F.2d 566, 568 (2d Cir.1971); S.Rep. No. 1333, 79th Cong., 2d Sess. 1, *reprinted in* 1946 U.S.Code Cong.Serv. Applying this standard, the district court found that Jesmar's Cabbage Patch Kids dolls with their Spanish-language birth certificates, adoption papers, and instructions are materially different from the Coleco dolls with English-language papers. The court also concluded, on the basis of numerous letters from parents and child doll owners or "parents," that the sale in the United States of the Spanish-language dolls with the prominent English-language trademark causes the public to confuse or mistake the Spanish dolls for the Coleco dolls that they expect to be for sale. Together, these findings led the district court to hold Granada's sale of Jesmar dolls in the United States

actionable under 15 U.S.C. § 1114(1)(a). 640 F.Supp. at 933 (citing *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42 (2d Cir.1983)).

■ Granada's principal argument is that the central purpose of a trademark is to identify the owner of the trademark as the source of the goods. Accordingly, the argument runs, the role of trademark laws is to prevent an infringer from passing off its goods as being those of another. There would thus be no infringement here because Jesmar's Cabbage Patch Kids dolls bear a genuine trademark that accurately portrays OAA as the originator, or in this case licensor, of the product. To back this line of reasoning, Granada cites three cases in this circuit as standing for the proposition that the unauthorized sale of authorized goods does not give rise to a claim for trademark infringement. Unfortunately for Granada, however, we do not find that these cases support its interpretation of the Lanham Act.

For example, in *DEP Corp. v. Interstate Cigar Co.*, 622 F.2d 621 (2d Cir.1980), this court upheld the dismissal of a Lanham Act claim by a United States distributor of an English soap against a gray goods importer because the distributor had no property interest in the trademark. In dicta the court noted that it would be "anomalous" if the sale of genuine goods could support an infringement action. *Id.* at 622 n. 1. But the court also noted that *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923), appeared to the contrary and, in the end, concluded that it need not reach the issue in the case because the plaintiff had no standing to assert trademark infringement.

Granada also cites *El Greco Leather Products Co. v. Shoe World Inc.*, 599 F.Supp. 1380 (E.D.N.Y.1984), which found that the trademark owner's rights were not infringed by the unauthorized sale in the United States of trademarked shoes even though the shoes had not been accepted or approved for sale by the owner. But this decision was recently reversed in this court on appeal, *El Greco Leather Products Co. v. Shoe World Inc.*, 806 F.2d 392 (2d Cir.

1986), on the ground that while the shoes had been manufactured by agreement with the trademark owner, they were not "genuine" for purposes of trademark infringement because the shoes were sold without being inspected by the owner to insure quality. The unauthorized disposition of the shoes without inspection deprived the owner of the right to control the product and could mislead consumers into believing that the trademark owner had approved the shoes for sale. Thus, in *El Greco* we concluded that the owner was entitled to relief under section 1114 of the Lanham Act against the seller of goods that bore the owner's mark but had not been inspected, accepted, or authorized for sale in the United States.

The third case cited by Granada, *Sasson Jeans, Inc. v. Sasson Jeans, L.A., Inc.*, 632 F.Supp. 1525 (S.D.N.Y.1986), which involved unauthorized sales in the United States of surplus blue jeans manufactured overseas under license, is similarly unsupportive. In *Sasson Jeans*, the court recognized that the heart of the Lanham Act claim was potential confusion by the consumer as to the origin or source of the goods. 632 F.Supp. at 1527 (citing *Standard & Poor's Corp. v. Commodity Exchange, Inc.*, 683 F.2d 704, 708 (2d Cir. 1982)). The court ruled that there was no trademark infringement because the jeans were "genuine," that is, their production was authorized by contract, they were labeled with the trademark with the intent that they be sold in the United States, and they were sufficiently similar that they could not give rise to the confusion section 1114 was intended to prevent. *See Sasson Jeans*, 632 F.Supp. at 1528–29; *see also Monte Carlo Shirt, Inc. v. Daewoo International (America) Corp.*, 707 F.2d 1054, 1058 (9th Cir.1983) (surplus shirts were "the genuine product, planned and sponsored by Monte Carlo and produced for it on contract for future sale"); *Diamond Supply Co. v. Prudential Paper Products Co.*, 589 F.Supp. 470, 475 (S.D.N.Y.1984) (paper products were produced under contract and "identical or qualitatively equivalent"); *Ballet Makers, Inc. v. United States Shoe Corp.*, 633 F.Supp. 1328, 1334–

35 (S.D.N.Y.1986) (subsequent licensee's use of trademark does not infringe prior licensee's rights when goods are "genuine" and owner approved both goods for U.S. distribution).

But as OAA notes and the district court concluded, the present case is distinguishable from the above cases because Jesmar's dolls were not intended to be sold in the United States and, most importantly, were materially different from the Coleco Cabbage Patch Kids dolls sold in the United States. There is a very real difference in the product itself—the foreign language adoption papers and birth certificate, coupled with the United States fulfillment houses' inability or unwillingness to process Jesmar's adoption papers or mail adoption certificates and birthday cards to Jesmar doll owners, and the concomitant inability of consumers to "adopt" the dolls. It is this difference that creates the confusion over the source of the product and results in a loss of OAA's and Coleco's good will. Thus, even though the goods do bear OAA's trademark and were manufactured under license with OAA, they are not "genuine" goods because they differ from the Coleco dolls and were not authorized for sale in the United States. This case is therefore closer to *Osawa & Co. v. B & H Photo*, 589 F.Supp. 1163, 1171–74 (S.D.N.Y. 1984), in which Judge Leval rejected the principle that a trademark lawfully affixed in one country carried the mark lawfully wherever it went and found that gray good Mamiya cameras imported into the United States in violation of a Customs Service exclusion order infringed upon the American distributor's trademark. *See also Ballet Makers*, 633 F.Supp. at 1334 (distinguishing *Osawa* and *A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923) from cases in which the trademark owner had authorized the goods for U.S. distribution). As in *Osawa*, OAA's domestic good will is being damaged by consumer confusion caused by the importation of the Jesmar dolls.

Admittedly, this case is different from *Osawa* because it is OAA that owns and controls the trademark on Jesmar Cabbage Patch Kids dolls. Citing *Parfums Stern,*

*Inc. v. United States Customs Service*, 575 F.Supp. 416, 419–20 (S.D.Fla.1983), Granada argues accordingly that there can be no infringement here because OAA cannot be damaged by sales of its own goods. Although this argument has some force in cases where the imported goods are identical to the domestic goods and are intended for sale in the United States, as in *Sasson Jeans* or *Monte Carlo Shirt*, for example, in a case such as this where the goods are confusingly different, the argument ignores the fact that section 1114 was intended to prevent any consumer confusion over similar goods. In light of this statutory purpose, the fact that a single entity owns the trademark worldwide is not dispositive.

■ *Bell & Howell: Mamiya Co. v. Masel Supply Co.*, 719 F.2d 42, 45–46 (2d Cir.1983), another gray goods case, is also distinguishable from the present case because it ruled only that a preliminary injunction should be denied when there was an inadequate showing of irreparable injury due to confusion and less drastic interim remedies could be adopted. Here there is a more than adequate showing of confusion over the source of the Cabbage Patch Kids dolls and sufficient evidence of damage to OAA's good will to support the permanent injunction. *Cf. Premier Dental Products Co. v. Darby Dental Supply Co.*, 794 F.2d 850, 859 (3d Cir.1986) (finding irreparable damage to good will even though gray good was identical to goods sold by trademark owner), *cert. denied*, —— U.S. ——, 107 S.Ct. 436, 93 L.Ed.2d 385 (1986).

■ Granada argues further that OAA consented to the importation of Jesmar dolls. This contention is meritless. Although OAA's filing of the names of its licensed producers pursuant to Customs regulations, 19 C.F.R. § 133.2 (1986), did allow the goods to pass through Customs, this does not extinguish OAA's rights to claim infringement or seek exclusion, as we have said, in a private suit in federal court. *See Olympus Corp. v. United States*, 792 F.2d at 320; *Vivitar Corp. v. United States*, 761 F.2d at 1570. The recordation of the trademark and its concomitant appli-

cation listing Jesmar as a licensee simply operates to ease Customs' administrative chores, not as authorization to import.

 Granada also argues that the court erred in dismissing its antitrust counterclaims. Although Granada recognizes that under *Continental T.V., Inc. v. GTE Sylvania Inc.*, 433 U.S. 36, 97 S.Ct. 2549, 53 L.Ed.2d 568 (1977), territorial restrictions on product resale do not amount to a per se violation of the Sherman Act, *see Olympus Corp.*, 792 F.2d at 319–20, it nonetheless makes the vague allegation that the "wide disparity in price" here and abroad and the shortage of Coleco's Cabbage Patch Kids dolls in the United States are suggestive of an antitrust violation. The district court, however, correctly dismissed this counterclaim on the ground that Granada had alleged no antitrust injury that would give it standing to challenge OAA's acts. Indeed, the court found, and we agree, that gray goods importers such as Granada would have benefited from any anticompetitive conduct. *Cf. W. Goebel Porzellanfabrik v. Action Industries, Inc.*, 589 F.Supp. 763, 766 (S.D.N.Y.1984) (antitrust counterclaim to gray good copyright infringement suit dismissed because importer would have benefited from high domestic prices). Finally, any claim by Granada that the infringement suit itself is an antitrust violation fails because there is no evidence that the suit was brought in bad faith, to harass, or in any way such that it would not be immune from antitrust strictures under the *Noerr-Pennington* doctrine. *See id.* at 767.

Granada's arguments regarding damages are premature and can be heard at the forthcoming damages hearing.

Judgment affirmed.

CARDAMONE, Circuit Judge, concurring:

The majority states that the imported dolls were not intended to be sold in the United States and were "different" from those of the mark's owner because the adoption papers and birth certificates were in Spanish. It is this difference, the majority continues, that creates confusion over the source of the product and constitutes the Lanham Act violation. I also believe that the importation of the Spanish produced Cabbage Patch dolls infringes the owner's trademark and should be permanently enjoined. While I agree with the majority that there is "confusion over the source of the product," I respectfully reach this conclusion for somewhat different reasons.

I

The essential element of an action under § 32 of the Lanham Act, 15 U.S.C. § 1114 (1982), is a showing of the likelihood of consumer confusion as to source of origin. *See, e.g., Church of Scientology Int'l v. The Elmira Mission of the Church of Scientology*, 794 F.2d 38, 43 (2d Cir.1986); *Miss Universe, Inc. v. Patricelli*, 753 F.2d 235, 237 (2d Cir.1985); *Berlitz Schools of Languages, Inc. v. Everest House*, 619 F.2d 211, 215 (2d Cir.1980); *McGregor-Doniger Inc. v. Drizzle Inc.*, 599 F.2d 1126, 1130 (2d Cir.1979); *Mushroom Makers, Inc. v. R.G. Barry Corp.*, 580 F.2d 44, 47 (2d Cir.1978), *cert. denied*, 439 U.S. 1116, 99 S.Ct. 1022, 59 L.Ed.2d 75 (1979) (per curiam). Because parallel goods are generally considered to be the "genuine" product of the foreign trademark owner, *see, e.g., A. Bourjois & Co. v. Katzel*, 260 U.S. 689, 691–92, 43 S.Ct. 244, 245, 67 L.Ed. 464 (1923); 3A R. Callmann *Unfair Competition, Trademarks and Monopolies* § 21.17, at 74 (L. Altman 4th ed. 1983), the traditional Lanham Act consumer confusion test becomes difficult to apply. Lipner, *The Legality of Parallel Imports: Trademark, Antitrust, or Equity?*, 19 Tex.Int'l L.J. 553, 568 (1984). Hence, to determine whether the importation of "genuine" Cabbage Patch dolls creates a likelihood of confusion as to their "source", it is necessary to examine the functions and principles of trademark law.

A. *Trade Identity Theory*

Under the trade identity theory of trademark law, the only function of this body of law is to identify the ultimate source of the goods, i,e., the owner of the mark, 3A R. Callmann, *supra*, at 76; 2 S. Ladas, *Pat-*

ents, *Trademarks and Related Rights* § 732, at 1341 (1975); Takamatsu, *Parallel Importation of Trademarked Goods: A Comparative Analysis,* 57 Wash.L.Rev. 433, 453 (1982). Where, as here, the domestic owner of the mark has licensed the use of its mark by a foreign manufacturer, this theory logically leads to the conclusion that there can be no confusion as to source. 3A R. Callmann, *supra;* 2 S. Ladas, *supra;* Takamatsu, *supra,* at 457. Hence, it cannot serve as the rationale for granting a Lanham Act injunction.

### B. *The Guarantee Function*

Many commentators however recognize that trademark law also serves to guarantee the quality of the trademarked product. 3A R. Callmann, *supra,* at 75; 2 S. Ladas, *supra;* 1 J. McCarthy, *Trademarks and Unfair Competition,* § 18.13, at 827 (2d ed. 1984). This is particularly apparent in the licensing context where the mark's owner licenses another to manufacture the product while retaining only the right to control quality. *See* 1 J. McCarthy, *supra,* at 826–28. We have labelled that control which the licensor retains "sponsorship," *Societe Comptoir De L'Industrie Cotonniere v. Alexander's Dep't Stores,* 299 F.2d 33, 35 (2d Cir.1962), and have deemed confusion as to "sponsorship" to be confusion as to "source of origin." *Id.*

Recognizing that sponsorship includes quality control—and viewing the territorial sales restrictions imposed by OAA as a means of quality control—it follows that Granada's importation of dolls with Spanish birth certificates, adoption papers and instructions into the United States may confuse the public as to whether OAA "sponsored" the importation of what the public perceives to be inferior dolls. This confusion is sufficient to constitute a violation of the Lanham Act. *See* Takamatsu, *supra,* 457–58 (acceptance of the guarantee function leads to the conclusion that the importation of goods of different quality is trademark infringement, even where domestic and foreign marks are owned by the same person); 2 S. Ladas, *supra* (same). *See also* 4A Callmann, *supra,* § 26.27, at 63–64 ("Here ... we may have some other

form of confusion, involving for example the guarantee function of trademarks rather than the source-identification function.") (footnotes omitted).

The necessity of providing a remedy against quality infringement by third-parties is particularly essential in a licensing arrangement because the Lanham Act imposes an affirmative duty upon the licensor to maintain quality control. *See Church of Scientology,* 794 F.2d at 43; *Franchised Stores of New York, Inc. v. Winter,* 394 F.2d 664, 669 (2d Cir.1968). As we noted in *Franchised Stores,* "[i]t would be anomalous ... to burden the trademark owner with this 'affirmative' duty and then ... deny him a federal forum in which to control his licensees." 394 F.2d at 669.

Even the guarantee function, in my view, is not entirely free from doubt as a basis for issuing an injunction. It has been argued that the importation of genuine but inferior goods of a foreign licensee is the fault of the trademark owner "in not exercising adequate supervision of the mark," and that its failure "should not be a justification for protecting it under the *trademark* laws for the situation it has created." *See* Vandenburgh, *The Problem of Importation of Genuinely Marked Goods is Not a Trademark Problem,* 49 Trade Mark Rptr. 707, 716 (1959) (emphasis in original). *See also Parfums Stern, Inc. v. United States Customs Service,* 575 F.Supp. 416, 419 (S.D.Fla.1983) (Criticizing mark owner for seeking federal trademark protection "to insulate itself from what it placed in motion itself through its own foreign manufacturing and distribution sources.").

This argument is not persuasive when, as in this case, it is not clear that OAA could not have prevented by contract the importation of these Cabbage Patch dolls by third-party distributors, such as Granada. As a practical matter OAA appears to have tried. Under its license Jesmar agreed not to sell outside its Spanish-licensed territory, and further agreed to sell only to purchasers who also agreed not to sell outside that territory. Without any effective means of further controlling the distribution of its product, for example, by means of an eq-

uitable servitude on the dolls, OAA should not be held responsible for the dolls' importation. *See, e.g.,* 2 R. Callmann, *supra,* § 16.16 at 83 ("[Equitable] servitudes have not been the basis of any holding barring parallel imports of genuine trademarked goods"); Z. Chafee, *The Music Goes Round and Round: Equitable Servitudes and Chattels,* 69 Harv.L.Rev. 1250, 1255–56 (1956) (only scarce authority on the validity of equitable servitudes on chattels). Significantly, the only other situation in which trademark laws have been used against admittedly "genuine" goods arose when the U.S. owner of the mark did not have a contract remedy available to prevent the importation of the foreign product. *See A. Bourjois & Co. v. Katzel,* 260 U.S. 689, 43 S.Ct. 244, 67 L.Ed. 464 (1923).

### C. *The Exhaustion Doctrine*

Several commentators have suggested that the trademark doctrine of "exhaustion" also cuts against a finding of infringement in the importation of parallel goods. *See, e.g.,* 3A R. Callmann, *supra,* § 21.17, at 75. Simply put, this doctrine provides that a distributor, like Granada, has the "right to resell a branded item in an unchanged state." 2 J. McCarthy, *supra,* § 25.11, at 261. *See also* Takamatsu, *supra,* at 456. The rationale underlying this doctrine is that trademark rights are exhausted once the trademarked goods have been duly placed into the market. Takamatsu, *supra.* But it is well-recognized that the exhaustion doctrine does not apply to genuine goods which have been altered. *See* 2 J. McCarthy, *supra,* § 25.10 at 259.

Here, because the dolls were manufactured and sold by Jesmar as authorized and licensed by OAA and not physically altered thereafter, it might be argued that Granada should be able to resell them in this unaltered state. The more persuasive view, I believe, is that the "exhaustion" doctrine does not apply with equal force in the international context. *See* 2 S. Ladas, *supra,* § 732, at 1341, Takamatsu, *supra,* at 457. Here the same mark has been attached to essentially two different products in the two countries, and each product has developed its own goodwill in its country. Although the Spanish dolls have not been *physically* altered during their importation, the sale of these dolls in the U.S. upsets the settled expectations of U.S. consumers about what they will receive when they purchase a Cabbage Patch doll. Because an American consumer would be disappointed by the same doll that would satisfy a Spanish consumer, the very act of importing different goods may be viewed, in an abstract sense, as an alteration of the doll.

### II

In sum, the district court properly granted OAA the injunctive relief it requested. Once one adopts the guarantee function of trademark law, it becomes clear that OAA has a right to relief from potential consumer confusion as to whether it sponsored the importation of these genuine but "inferior" dolls. It is this violation of the mark owner's right to control the quality of its product, that is to say its sponsorship, that is deemed confusion as to source.

For these reasons, I conclude that Granada's importation of the Jesmar dolls creates the likelihood of consumer confusion as to source of origin and thus constitutes a violation of the Lanham Act. Consequently, I join the majority in voting to affirm the district court's issuance of an injunction to prevent further importation.