**FERRERO U.S.A., INC., Plaintiff,**

v.

**OZAK TRADING, INC. and Doron Gratch, Defendants.**

**Civ. A. No. 88–3506.**

United States District Court, D. New Jersey.

Jan. 2, 1991.

Frank Holahan, Harwood Lloyd, Hackensack, N.J., and G. Franklin Rothwell, Raymond A. Kurz, Bernard, Rothwell & Brown, Washington, D.C., for plaintiff.

Franklyn C. Steinberg, III, Sweet, Steinberg & Connelly, Clinton, N.J., and Gerard F. Dunne, Wyatt, Gerbert, Burke & Badie, New York City, for defendants.

WOLIN, District Judge.

This is a trademark infringement action wherein genuine goods produced by an affiliated firm for a foreign market are imported into the United States bearing a trademark identical to a valid United States trademark. The critical inquiry is whether the imported product will be likely to cause customer and distributor confusion. The dispute is between plaintiff, Ferrero U.S.A., Inc. ("Ferrero U.S.A.") and Ozak Trading, Inc. ("Ozak Trading").

Plaintiff is the exclusive United States distributor for TIC TAC brand breath mints. Defendant is an importer who engaged in the parallel importation of TIC TAC breath mints manufactured for distribution in the United Kingdom. Because the foreign product is materially different in caloric content and size from the product distributed in the United States, Ferrero, U.S.A. asserts that Ozak Trading's distribution of these mints violated the Lanham Act § 32(1), 15 U.S.C. § 1114(1), trademark infringement, and § 43(a), 15 U.S.C. § 1125(a), unfair competition. Ozak Trading asserts that it legally purchased the goods from a foreign distributor and that its importation and sale of these "gray market goods" is not unlawful.[1]

In addition to its federal claims, Ferrero U.S.A. asserts a catalogue of state-based claims whose factual nucleus is the mirror image of the federal claims. Since these state-based claims are primarily duplicative of the plaintiff's federal assertions, the Court's pivotal focus will center on those claims grounded in federal law. Unrelated state-based claims will be dismissed because of a failure of proof.

Because of unresolved issues of fact, this matter was tried before the Court. Rule 52(a), Federal Rules of Civil Procedure. From the evidence presented, the Court concludes that Ozak Trading's parallel importation of United Kingdom TIC TAC which is materially different from the TIC TAC distributed by Ferrero, U.S.A. and the likelihood and probability of customer confusion results in a violation of the Lanham Act. It also constitutes unfair competition and false advertising under state law. Because of this finding, its future distribution is enjoined. Due to a failure of proof, no compensatory or punitive damages are awarded. Reasonable counsel fees and costs as provided by statute will be awarded to plaintiff, because this case qualifies as an exceptional case under the statute, 15 U.S.C. § 1117(a). The Court's findings of fact and conclusions of law are contained in the main body of this Opinion.[2]

## I. FINDINGS OF FACT

### A. *Background*

1. Ferrero U.S.A. is a corporation organized and existing under the laws of Delaware with its principal place of business located at 295 Madison Avenue, New York, New York 10017.

2. Ozak Trading is a corporation organized and existing under the laws of New York, with its principal place of business located at 101 Route 46, Saddlebrook, New Jersey 07662.

3. Doron Gratch ("Gratch") is President of Ozak and owns a majority interest in Ozak. Gratch works at Ozak's address.

---

**1.** The term "gray-market goods" refers to foreign manufactured goods, registered under a valid United States trademark, that are legally purchased abroad and imported into the United States without the consent of the American trademark holder/authorized distributor.

**2.** Any finding of fact or conclusion of law stated which might properly be considered or characterized as the other should be considered as such and is deemed incorporated into the section within which it belongs.

4. Ferrero S.p.A. is an Italian corporation that manufactures confectionery products including TIC TAC mints.

5. Ferrero U.S.A. and Ferrero S.p.A.[3] are sister companies under the ultimate control of Intercandy, B.V. The Ferrero family, under the direction of Michale Ferrero, President of Intercandy, controls the Ferrero affiliated companies.

6. Ferrero S.p.A. gave to Ferrero U.S.A. distribution rights in the United States and Canada via oral agreement on August 1, 1969 [4]. A formal written agreement was negotiated between Ferrero S.p.A. and Ferrero U.S.A. in January of 1990 providing Ferrero U.S.A. with exclusive distribution rights in the United States and Canada. Although this document was prepared after this litigation commenced, the Court is satisfied that as to exclusive distribution rights only it accurately codifies the understood operating arrangement that had previously existed between Ferrero U.S.A. and Ferrero S.p.A. since 1978.

7. P. Ferrero & C. S.p.A. obtained various United States Trademarks relating to the TIC TAC product including Federal Registration Nos. 983,418 (the TIC TAC name); 984,622 (a close variation on the TIC TAC name); and 1,014,803 (the TIC TAC logo) and 1,102,282 (the package design, not including color). These trademarks were in the main registered in 1978 or before. These registrations are now owned by Ferrero S.p.A. SF ¶ 5.

8. Ferrero U.S.A. does not modify its TIC TAC product (the individual mints) for distribution in any manner from the time of their manufacture in Italy by Ferrero S.p.A. SF ¶ 21.[5]

9. The individual boxes of TIC TAC breath mints distributed by Ferrero U.S.A. are most commonly packed and shipped in refill trays of 12 boxes per tray and two trays per package. There are 12 packages per case making a total of 288 boxes per case. SF ¶ 13.

10. Two thousand cases of TIC TAC make one container of the type used for overseas transport. SF ¶ 14.

11. Ferrero U.S.A. is responsible for all aspects of marketing the product in the United States. Its involvement includes the following: product formulation, packaging, labeling advertising (including testing, research and strategy), promotions and pricing [6]. T38:12–24.[7]

12. Ferrero U.S.A. retains outside advertising agencies and authorizes reports and studies in connection with its marketing responsibilities. SF ¶¶ 10, 12.

13. TIC TAC's market share dropped from a high of 10 percent in the early 1970's to about 2½ percent in 1979–80. T47:16–19. During this time, the product was aimed primarily at the children's market.

## B. *Advertising Strategy*

14. During 1979 Ferrero U.S.A. ceased its children oriented advertising and redirected its marketing effort. It embarked upon a strategy which would provide it long-term success in the adult market. The pivotal focus in this strategy was to emphasize the fact that TIC TAC, which contain sugar, only had 1½ calories per mint whereas many other competitive sugar-free mints contained more calories.

15. Research and testing done by Ferrero U.S.A. determined that TIC TAC kept one's breath refreshed for 1½ hours.

16. Ferrero U.S.A. initiated an advertising campaign that was broad-based, using print and television media, as well as consumer promotions (*e.g.*, coupons) and contests to promote TIC TAC's new image.

---

**3.** Ferrero S.p.A. is directly owned by the Italian holding company, P. Ferrero & C. S.p.A.

**4.** Until about October, 1978, Progresso Foods Corporation was also an authorized distributor of TIC TAC product in the United States.

**5.** "SF" refers to the statement of stipulated facts agreed to by both parties before United States

Magistrate G. Donald Haneke on August 21, 1989.

**6.** Included in its responsibilities is display of the product. A common vehicle for this is the Ferrero U.S.A. tree display.

**7.** "T" references are to the trial transcript.

From 1980 until 1987 Ferrero U.S.A. spent over 31 million dollars on media and advertising to implement its redirected concentration on the adult market. T135:11–13.

17. Among the slogans utilized in connection with advertising and promoting TIC TAC breath mints are the following: THE 1½–CALORIE BREATH MINT; THE 1½ HOUR, 1½ CALORIE BREATH MINT; TIC TAC 1½ HOUR, 1½ CALORIE BREATH MINT. These slogans are registered in the U.S. Patent and Trademark Office in the name of Ferrero S.p.A., Registration Nos. 1,379,849; 1,386,386; and 1,451,105. Other Trademark's registered after 1979 include: 1,220,224 (a marketing logo); 1,269,408 (a packaging logo)[8]; 1,343,041 (the TIC TAC logo); 1,390,123 (the package design); and 1,390,124 (the TIC TAC logo including color).

18. As a result of Ferrero U.S.A.'s media and advertising efforts, TIC TAC's share of the candy mint market jumped from 2.5 percent in 1980 to 16.58 percent for the 52 week period ending in May 1990. T236:9–18.

## C. *The Gray Goods*

19. On December 30, 1986, Ozak imported 722 cases of product bearing the mark TIC TAC, as prepared and packaged for sale in the United Kingdom. This product was sold in the United States in 1987. In 1988, Ozak imported an additional container (2,000 cases) of TIC TAC and sold this product in 1988 and 1989. Ozak modified the labeling on some of this product with inkjet printing. SF ¶¶ 16, 19.

20. The gray market goods imported into the United States, although genuine, were obtained from non-Ferrero group trading companies based in the United Kingdom. Ozak did not seek or receive permission from any Ferrero company in connection with these transactions. T346:8–T347:17.

## D. *Differences in the Product*

(1) Size/Caloric Content

21. Ferrero S.p.A. produces two different grades of TIC TAC pellets. The TIC

TAC pellets distributed by Ferrero U.S.A. contain 1½ calories per mint. SF ¶ 7. The TIC TAC pellets sold by Ozak contain two calories per mint and are larger in size and weight than the TIC TAC product sold by Ferrero U.S.A. SF ¶ 17.

22. Although the calorie difference is but half a calorie, and seemingly insubstantial, the inequivalence amounts to one-third more calories per mint given a base of 1½ calories. Ferrero U.S.A. has constructed its long-term marketing strategy based upon a 1½ calorie product and Ferrero S.p.A. has registered with the United States Patent and Trademark Office materials that complement such strategy.

(2) Packaging

23. The TIC TAC product respectively distributed by Ferrero U.S.A. and Ozak are both sold in small, clear plastic containers slightly larger than a match box. Based upon personal observation, the Court finds that the containers are the same size and shape. The positioning on the containers of the labels, logos and the coloring of such labels is also virtually identical.

24. Ferrero U.S.A.'s product is embossed with the "Ferrero" name in small lettering on the bottom of the box while that imported by Ozak merely has an "F."

25. Additionally, the plastic flip lid on the Ferrero U.S.A. package has a pliable plastic hinge and is sturdier and more securely fastened than the lid on the Ozak product.

(3) Labeling

26. The Ferrero U.S.A. product label does not indicate that Ferrero U.S.A. is the exclusive importer for the United States; the Ferrero U.K. product does indicate that Ferrero U.K. is the "sole importer for the U.K."

27. Ozak employed black inkjet print to affix the calorie count (two) and net weight (.5 ounces) to the packages it imported.

---

**8.** This trademark was originally registered in the name of P. Ferrero & C. S.p.A.

28. The discrepancies between the labeling information contained on the TIC TAC product imported into the United States by Ozak and that distributed by Ferrero U.S.A. varies based upon the flavor of product being examined. In general, the TIC TAC product imported by Ozak, unlike the Ferrero U.S.A. product, did not contain information concerning serving size, servings per container, or nutrient and mineral composition.

29. The Ozak products contained the English spelling of words such as "flavour" and "colour" as well as differing UPC bar codes. The Ferrero U.S.A. product employed the spelling of "flavor" and "color" as commonly accepted and used in the United States.

30. FDA regulation 21 C.F.R. 101.9(c)(3) requires that if a statement of caloric content is made, the label must contain caloric information to the nearest 2 (two) calorie increment up to and including 20 calories. Therefore, all TIC TAC branded products distributed in the United States which have a caloric claim are required to contain an indication that there are 2 (two) calories per mint, even if there are only 1½ calories per mint. SF ¶ 32. The Ferrero U.S.A. product label indicates that the two calorie designation was "rounded from 1.5."

31. The spearmint TIC TAC product imported by Ozak contains the U.K. food color E102 which is the equivalent of FD & C Yellow Number 5. Food products sold in the United States and intended for human consumption are required to indicate use of such dye by its FD & C name. No such representation is made.

(4) Composition

32. The TIC TAC product imported by Ozak differs from the Ferrero U.S.A. product not only in caloric content and size, but also in chemical composition. The spearmint TIC TAC product imported by Ozak contains the U.K. food color additive E131. This additive (also known as Patent Blue V) is banned in the United States.

33. The Federal Food and Drug Administration requested that Ozak initiate a recall of the Ozak spearmint flavor TIC TAC in the fall of 1988. Ozak complied with the request.

## II. CONCLUSIONS OF LAW

### A. *Jurisdiction & Standing*

The Lanham Act claims arise under the laws of the United States and, in particular, under an act of Congress relating to trademarks which provides that the district courts shall have original jurisdiction under 15 U.S.C. § 1121, and this Court also had jurisdiction pursuant to 28 U.S.C. §§ 1331 and 1338(a). Since plaintiff's unfair competition and false advertising claims are based on the same operative facts as the federal trademark claims, and are joined with a substantial and related claim under the trademark laws, 28 U.S.C. § 1338(b) affords this Court jurisdiction over these claims as well.

■ Ferrero U.S.A. also alleges three state-based claims, unjust enrichment and misappropriation, interference with contractual relations, and violation of New Jersey's Consumer Fraud Act, and requests that this Court accept pendent jurisdiction over these issues. Because "[P]endent jurisdiction is a doctrine of discretion, not of plaintiff's right." *United Mine Workers v. Gibbs*, 383 U.S. 715, 726, 86 S.Ct. 1130, 1139, 16 L.Ed.2d 218 (1966), the Court has discretion in determining whether or not to hear these issues and must weigh the interests of comity versus judicial efficiency. The critical inquiry to be engaged in is whether the federal and state claims "derive from a common nucleus of operative fact" such that a plaintiff "would ordinarily be expected to try them all in one judicial proceeding." *Nanavati v. Burdette Tomlin Memorial Hospital*, 857 F.2d 96 (3d Cir 1988), *cert. denied*, 489 U.S. 1078, 109 S.Ct. 1528, 103 L.Ed.2d 834 (1989) (citing *United Mine Workers*, 383 U.S. at 725, 86 S.Ct. at 1138). The court shall invoke its pendent jurisdiction since the claims stem from the same nucleus of operative fact and joint disposition will promote judicial economy.

■ Defendant's also refute plaintiff's standing to initiate this action and enforce

the trademarks at issue in this litigation since Ferrero U.S.A. is not the owner or registrant of such trademarks. Use of the broad phraseology "any person" in the Lanham Act §§ 32(1), 43(a), 15 U.S.C. §§ 1114(1), 1125(a) denotes an intent not to limit enforcement to merely the trademark owner. *FRA S.p.A. v. Surg–O–Flex of America, Inc.*, 415 F.Supp. 421, 425 (S.D.N. Y.1976). Moreover, there is a long-standing history of permitting the exclusive user of a trademark to enforce a trademark on behalf of its rightful owner. *See G.H. Mumm Champagne v. Eastern Wine Corp.*, 142 F.2d 499, 502 (2d Cir.1944), *cert. denied*, 323 U.S. 715, 65 S.Ct. 41, 89 L.Ed. 575 (1944). *See also Alfred Dunhill of London, Inc. v. Kasser Distillers Products Corp.*, 350 F.Supp. 1341, 1345 n. 2 (E.D.Pa. 1972), *aff'd*, 480 F.2d 917 (3d Cir.1973).

Given the factual background of this case, namely that Ferrero U.S.A. has spent substantial time and effort developing its market position, based upon trademarks owned by an affiliated corporation, Ferrero S.p.A., Ferrero U.S.A. is truly the interested party in this litigation. To deny plaintiff standing in this matter merely because it is not the registered trademark owner would not only be contrary to the case law permitting suits to be maintained by exclusive licensee's but also would deny the reality of the actual party in interest.

Additionally, Ferrero S.p.A. could merely refile this suit, on its own behalf, or draft a letter authorizing Ferrero U.S.A. to enforce its trademark rights pursuant to ¶ 11.5 of the written distributorship agreement formalized in January of 1990.[9]

The Court thus determines that Ferrero U.S.A., as exclusive distributor and user of TIC TAC in the United States, has sufficient interest and legal standing to maintain this suit.

**B.** *Trademark Infringement & Related Claims*

**(1) Trademark Infringement**

■ Before continuing and analyzing the allegations leveled against Ozak, it is nec-essary to delineate the controlling statutes in light of the conduct complained of. Ferrero U.S.A. contends that Ozak's activities vis-a-vis the importation of Ferrero Ltd. TIC TAC from the United Kingdom infringed its trademark and offended the Lanham Act § 32(1) and constituted unfair competition pursuant to § 43(a) of the Lanham Act. Section 32(1) provides:

> (1) Any person who shall, without the consent of the registrant—
>
> > (a) use in commerce any reproduction, counterfeit, copy, or colorable imitation of a registered mark in connection with the sale, offering for sale, distribution, or advertising of any goods or services on or in connection with such use is **likely to cause confusion, or to cause mistake, or deceive;** ...
>
> shall be liable in a civil action by the registrant for the remedies hereinafter provided.

15 U.S.C. § 1114(1)(a) (1988) (emphasis added). Section 43(a) provides:

> (a) Any person who, on or in connection with any goods or services, or any container for goods, uses in commerce any word, term, name, symbol, or device, or any combination thereof, or any false designation of origin, false or misleading description of fact, or false or misleading representation of fact, which—
>
> > (1) is **likely to cause confusion, or to cause mistake, or to deceive** as to the affiliation, connection, or association of such person with another person, or as to the origin, sponsorship, or approval of his or her goods, services or commercial activities by another person, or
> >
> > (2) in commercial advertising or promotion, misrepresents the nature, characteristics, qualities, or geographic origin of his or her or another person's goods, services, or commercial activities,
>
> shall be liable in a civil action by any person who believes that he or she is or is likely to be damaged by such act.

---

**9.** The Court does not accord much weight or validity to the written distributorship agreement struck in January 1990. *See infra* § I ¶ 6. The absence of such a letter, however, does not remove Ferrero U.S.A.'s interest or authority to bring this suit.

15 U.S.C. § 1125(a) (1988) (emphasis added).

In examining how other courts have dealt with the question of gray market goods, which are genuine goods protected by the respective trademark of their country of origin, the Court looks to three principal cases for guidance: *Original Appalachian Artworks v. Granada Electronics, Inc.*, 816 F.2d 68 (2d Cir.1987), *cert. denied*, 484 U.S. 847, 108 S.Ct. 143, 98 L.Ed.2d 99 (1982); *Lever Brothers Co. v. United States*, 877 F.2d 101 (D.C.Cir.1989); and *Weil Ceramics and Glass, Inc. v. Dash*, 878 F.2d 659 (3d Cir.1989), *cert. denied*, —— U.S. ——, 110 S.Ct. 156, 107 L.Ed.2d 114 (1989).

The court in *Original Appalachian Artworks* affirmed the permanent injunction given to the trademark owner against an importer who had purchased goods manufactured abroad under license from the trademark owner. Although the gray market goods involved in the dispute were genuine, they contained sufficient differences so as to generate potential customer confusion as to the source of the product. Because of these differences, the court determined that the trademark owner had the right to control the quality of product in order to prevent these "inferior" products from coming to market.

In *Lever Brothers* the court likewise afforded the American trademark owner preliminary injunctive relief against the Customs Service in order to bar third parties from importing materially different versions of their product. The court based its relief upon Section 42 of the Lanham Act:

> [I]t bars [importation of] foreign goods bearing a trademark identical to a valid US trademark but physically different regardless of the trademarks' genuine

character abroad or affiliation between the producing firms. On its face the section appears to aim at deceit and customer confusion; when identical trademarks have acquired different meaning in different countries, one who imports the foreign version to sell it under that trademark will (in the absence of some specially differentiating feature) cause the confusion Congress sought to avoid. The fact of affiliation between the producers in no way reduces the probability of that confusion; it is certainly not a constructive consent to the importation.

*Lever Brothers*, 877 F.2d at 111.

The court in *Weil Ceramics* dealt with a problem involving an American trademark holder, possessing exclusive distribution rights that were wholly owned by the European manufacturer. The exclusive distributor sought to enjoin the parallel importation of gray goods purchased by the importer from the manufacturer in Europe. The Court ruled that the Lanham Act provisions did not apply; the American trademark holder could not enjoin the importation. Although *Weil* in this district is the controlling law, two important distinctions must be made. In footnote 11 of its opinion, the Circuit court indicated that the districts court's determination that the grade and quality of the product offered for sale by the authorized licensee and the parallel importer were not materially different "is significant to our disposition of this appeal.... [W]e premise our decision on the assumption that the porcelain imported by Jalyn was essentially identical to that imported by Weil [the American Trademark holder/authorized distributor]." *Id.* at 668. Second, the foreign manufacturer supplied the competing parallel importer with the gray market goods in question.[10]

---

**10.** Section 42 of the Lanham Act, 15 U.S.C. § 1124 served as a basis for the trademark claims in both *Lever Brothers* and *Weil Ceramics*. Although that section is not at issue in this case, the reasoning and logic employed are germane to a § 43 violation. The court in *Weil* notes that §§ 32 and 42 of the Lanham Act promote the legislative intent and general policy goals behind the Act; the importation of genuine goods does not undermine the application of the Act. *Weil Ceramics*, 878 F.2d at 672.

The purpose underlying any trade-mark statute is twofold. One is to protect the public so it may be confident that, in purchasing a product bearing a particular trade-mark which it favorably knows, it will get the product which it asks for and wants to get. Secondly, where the owner of a trade-mark has spent energy, time and money in presenting to the public the product, he is protected in

With these three cases in mind, as well as the Court's findings of fact, denoting the material differences in the product, the Court is satisfied that defendant has violated the plaintiff's rights under the Lanham Act. Plaintiff developed a successful brand image around a 1½ calorie breath mint and there exists the likelihood of and potential for significant consumer and distributor confusion through the sale of a two calorie product that does not conform to the same labeling and content specifications.

Moreover, the sale of a product under the same trade name, TIC TAC, with virtually an identical outward appearance, that is materially different than the product consumers and distributors expect to receive, creates customer confusion, usurps the good will created by Ferrero U.S.A.'s marketing efforts and constitutes false advertising. This is especially true in a weight-conscious society where products with reduced calories are exalted and secure a competitive advantage over other higher-caloried products.

#### (2) Related State–Based Claims

 Ferrero U.S.A.'s assertion of unfair competition and false advertising under the laws of New Jersey, namely that consumers will falsely cross-associate the attributes of the U.K. TIC TAC product with that distributed by Ferrero U.S.A., is subsumed under the claimed violation of section 43(a) of the Lanham Act. *National Football League Properties v. N.J. Giants*, 637 F.Supp. 507, 519 (D.N.J.1986); *SK & F Co. v. Premo Pharmaceutical Laboratories, Inc.*, 625 F.2d 1055, 1065 (3d Cir 1980) ("The federal law of unfair competition is not significantly different, as it bears upon this case, from that of New Jersey."); *Estate of Presely v. Russen*, 513 F.Supp. 1339, 1376 (D.N.J.1981) ("Section 43(a) of

the Lanham Act ... afford[s] broad protection against various forms of unfair competition and false advertising"). Since this Court has found liability under the federal claims, judgment will accordingly be entered under these state-based claims as well.

#### (c) Unrelated State–Based Claims

Ferrero U.S.A. alleges three other state-based claims: unjust enrichment and misappropriation, interference with contractual relations and violation of New Jersey Consumer Fraud Act. Although it is true that Ozak did enjoy a "free-ride" on the advertising, good will and promotional efforts of Ferrero U.S.A., the necessary elements to be proved to sustain these state-based claims are missing. In light of the Court's holding on the federal claims and the related state-based claims, it declines to address an analysis to the issues presented by them and they will be dismissed without comment.

### III. CONCLUSION

For the reasons asserted above, judgment will be entered in favor of the plaintiff on Counts I, II, III and IV of the complaint as to each of the defendants. As to Counts V, VI and VII, judgment will be entered in favor of both defendants. Ozak Trading and Gratch are permanently enjoined from the importation and distribution of United Kingdom TIC TAC products in the United States. There shall be no award of compensatory or punitive damages. Upon application, because this case is "exceptional" under the Lanham Act, the Court will award reasonable attorneys' fees and costs.

---

his investment from its misappropriation by pirates and cheats.

> . . . . .

The Report stated further, in its enumeration of the specific goals of the Lanham Act, that the act would 'secure trademark owners in the goodwill which they have built up and ... protect the public from imposition by the use of counterfeit and imitated marks and false trade descriptions.

*Weil Ceramics*, 878 F.2d at 672 n. 17 (citing S.Rep. No. 1333, 19th Congress 2d Sess., reprinted in 1946 U.S.Code Cong.Serv. 1274, 1276). Overall, the main concern in both *Lever Brothers* and *Weil Ceramics* was the parallel importation of gray market goods. The analysis employed in assessing the impact of such action is no less valid and illuminating, merely because a differing statutory provision is in question.