200 F.3d 775 (Fed. Cir. 1999)
 GAMUT TRADING COMPANY, GAMUT IMPORTS, BAY IMPLEMENT COMPANY, CASTEEL FARM IMPLEMENT COMPANY (MONTICELLO, ARKANSAS), CASTEEL FARM IMPLEMENT COMPANY (PINE BLUFF, ARKANSAS), CASTEEL WORLD GROUP, INC., and TRACTOR SHOP, Appellants,
v.
UNITED STATES INTERNATIONAL TRADE COMMISSION, Appellee,
and
KUBOTA TRACTOR CORPORATION, KUBOTA MANUFACTURING OF AMERICA, and KUBOTA CORPORATION, Intervenors..
 97-1414
 United States Court of Appeals for the Federal Circuit
 DECIDED: December 27, 1999
 
 Appealed from: United States International Trade Commission MANUFACTURING OF AMERICA, and KUBOTA CORPORATION, United States Court of Appeals for the Federal Circuit Lloyd W. Walker, II, Bischoff & White, P.C., of Fayetteville, Georgia, argued for appellants. With him on the brief was Lloyd W. Walker, of Twin Falls, Indiana.
 Shara L. Aranoff, Attorney-Advisor, U.S. International Trade Commission, of Washington, DC, argued for appellee. With her on the brief were Lynn M. Schlitt, General Counsel, and James A. Toupin, Deputy General Counsel.
 Rory J. Radding, Pennie & Edmonds, LLP, of New York, New York, argued for intervenors. Of counsel on the brief were Darren W. Saunders, and Katherine E. Smith. Also on the brief was Marcia H. Sundeen, Pennie & Edmonds, LLP, of Washington, DC.
 Before RICH,* Circuit Judge, SMITH, Senior Circuit Judge, and NEWMAN, Circuit Judge.
 NEWMAN, Circuit Judge.
 
 
 1
 This action for violation of '337 of the Tariff Act of 1930, 19 U.S.C. '1337, was initiated at the United States International Trade Commission ("ITC") on the complaint of the Kubota Corporation, a Japanese company ("Kubota-Japan"), owner of the registered United States trademark "Kubota," and its United States affiliated companies Kubota Tractor Corporation ("Kubota-US") and Kubota Manufacturing of America ("KMA"). Kubota-US is the exclusive licensee of the "Kubota" trademark in the United States, by agreement with Kubota-Japan which provides that the United States trademark and associated goodwill remain the exclusive property of Kubota-Japan.
 
 
 2
 The respondents are Gamut Trading Company and other entities (collectively "Gamut") that import from Japan and resell in the United States various models of used tractors of under 50 horsepower, all manufactured in Japan by the Kubota Corporation, used in Japan, and bearing the mark "Kubota" that had been properly affixed in Japan. Gamut was charged with violation of '337 of the Tariff Act of 1930, 19 U.S.C. '1337, which provides for exclusion of product bearing infringing marks and other remedies, based on asserted infringement of the United States trademark "Kubota":
 
 
 3
 19 U.S.C. '1337 Unfair practices in import trade
 
 
 4
 (a)(1)(C) The importation into the United States, the sale for importation, or the sale within the United States after importation by the owner, importer, or consignee, of articles that infringe a valid and enforceable United States trademark registered under the Trademark Act of 1946.
 
 
 5
 Describing this case as one of "gray-market goods," the ITC issued a General Exclusion Order against importation of used Japanese tractors bearing the "Kubota" trademark, and Cease and Desist Orders against sale of such tractors that had already been imported into the United States. The principle of gray market law is that the importation of a product that was produced by the owner of the United States trademark or with its consent, but not authorized for sale in the United States, may, in appropriate cases, infringe the United States trademark.
 
 
 6
 On Gamut's appeal, we now affirm the decision of the ITC.[1]
 
 BACKGROUND
 
 7
 Kubota-Japan manufactures in Japan a large number of models of agricultural tractors, for use in Japan and other countries. Various tractor models are custom-designed for a particular use in a particular country. For example, tractor models that are designed for rice paddy farming are constructed for traction and maneuverability under wet, muddy conditions; these tractors have smaller tire separation in order to make tight turns in rice paddies, and are designed to function with rice paddy tillers, which contain narrow, light-weight blades. No corresponding model is designed for export to the United States.
 
 
 8
 In contrast, some tractor models that are intended to be used in the United States are specially constructed for lifting and transporting earth and rocks, and to function with rear cutters that contain heavy blades capable of cutting rough undergrowth; these models do not have a direct Japanese counterpart. The tractor models intended for sale and use in the United States bear English-language controls and warnings, and have English-language dealers and users manuals. They are imported by Kubota-US and sold through a nationwide dealership network which provides full maintenance and repair service and maintains an inventory of parts for these specific tractor models. Kubota-US conducts training classes for its dealership employees, instructing them on service and maintenance procedures.
 
 
 9
 Gamut purchases used Kubota tractors in Japan and imports them into the United States. The majority of the imported tractors are described as between 13 and 25 years old. All bear the mark "Kubota." The Kubota companies state that the importation and its extent came to their attention when United States purchasers sought service and repair or maintenance from Kubota-US dealerships.
 
 The Gray Market
 
 10
 The term "gray market goods" refers to genuine goods that in this case are of foreign manufacture, bearing a legally affixed foreign trademark that is the same mark as is registered in the United States; gray goods are legally acquired abroad and then imported without the consent of the United States trademark holder. See K Mart Corp. v. Cartier, Inc., 486 U.S. 281, 286-87, 6 USPQ2d 1897, 1899-00 (1987) (discussing various gray-market conditions); 4 McCarthy on Trademark and Unfair Competition '29.46 (4th ed. 1997). The conditions under which gray-market goods have been excluded implement the territorial nature of trademark registration, and reflect a legal recognition of the role of domestic business in establishing and maintaining the reputation and goodwill of a domestic trademark.
 
 
 11
 Until the Supreme Court's decision in A. Bourjois & Co. v. Katzel, 260 U.S. 689 (1923), the prevailing rule in the United States was that the authorized sale of a validly trademarked product, anywhere in the world, exhausted the trademark's exclusionary right; thus the holder of the corresponding registered United States trademark was believed to have no right to bar the importation and sale of authentically marked foreign goods. However, in the Bourjois case the Court recognized the territorial boundaries of trademarks, stressing that the reputation and goodwill of the holder of the corresponding United States mark warrants protection against unauthorized importation of goods bearing the same mark, although the mark was validly affixed in the foreign country. In Bourjois the foreign-origin goods were produced by an unrelated commercial entity and imported by a third person, although the goods themselves were related in that the United States trademark owner bought its materials from the foreign producer. See Id. at 692.
 
 
 12
 Since the Bourjois decision, the regional circuits and the Federal Circuit have drawn a variety of distinctions in applying gray market jurisprudence, primarily in consideration of whether the foreign source of the trademarked goods and the United States trademark holder are related commercial entities and whether the imported goods bearing the foreign mark are the same as (or not materially different from) the goods that are sold under the United States trademark, applying a standard of materiality suitable to considerations of consumer protection and support for the integrity of the trademarks of domestic purveyors, all with due consideration to the territorial nature of registered trademarks in the context of international trade.
 
 
 13
 Gamut directs our attention to cases in which the courts have refused to exclude gray market goods. For example, in NEC Electronics v. CAL Circuit Abco, 810 F.2d 1506, 1 USPQ2d 2056 (9th Cir. 1987) the court held that the importation of genuine NEC computer chips by the defendant, an entity unrelated to any NEC company, did not constitute infringement of the United States "NEC" trademark when there was no material difference between the NEC product imported by the defendant and the NEC product imported by the NEC United States subsidiary; the court distinguished Bourjois on the ground that in Bourjois the United States trademark owner could not control the quality of the unaffiliated foreign producer's goods, whereas when the companies are commonly controlled there is a reasonable assurance of similar quality. Id. at 1510, 1 USPQ2d at 2059.
 
 
 14
 A similar refusal to exclude was reached in Weil Ceramics & Glass, Inc. v. Dash, 878 F.2d 659, 11 USPQ2d 1001 (3d Cir. 1989), wherein the court held that the United States trademark "Lladro" was not infringed by importation and sale of authentic "Lladro" figurines by one other than the trademark holder. The court reasoned that there is no need to protect the consumer against confusion when the goods imported by the defendant are identical to the goods imported by the United States trademark holder. Id. at 672, 11 USPQ2d at 1012. The court also reasoned that when the foreign manufacturer and the United States trademark holder are related companies, there is no need to protect the domestic company's investment in goodwill based on the quality of the trademarked goods, for the foreign manufacturer has control over their quality and the goods (porcelain figurines) are unchanged from their original quality.
 
 
 15
 However, when there are material differences between the domestic product and the foreign product bearing the same mark, most of the courts that have considered the issue have excluded the gray goods, even when the holders of the domestic and foreign trademarks are related companies, on grounds of both safeguarding the goodwill of the domestic enterprise, and protecting consumers from confusion or deception as to the quality and nature of the product bearing the mark. Thus in Societe des Produits Nestle v. Casa Helvetia, Inc., 982 F.2d 633, 25 USPQ2d 1256 (1st Cir. 1992) the court held that the foreign owner of the United States trademark "Perugina" and its Puerto Rican subsidiary that imported Italian-made "Perugina" chocolate could prevent the importation of "Perugina" chocolate made under license in Venezuela, because the product is materially different in taste; the court referred to the likelihood of consumer confusion and loss of goodwill and integrity of the mark.
 
 
 16
 Similarly in Original Appalachian Artworks v. Granada Electronics, 816 F.2d 68, 73, 2 USPQ2d 1343, 1346 (2d Cir. 1987) the court held that the United States owner of the "Cabbage Patch" mark can prevent importation of "Cabbage Patch" dolls that were made and sold abroad under license from the United States owner, on the ground that the foreign dolls were materially different from the dolls authorized for sale in the United States because their instructions and adoption papers were in the Spanish language. See also Martin's Herend Imports, Inc. v. Diamond & Gem Trading USA, Co., 112 F.3d 1296, 42 USPQ2d 1801 (5th Cir. 1997) (foreign owner of United States trademark and domestic distributor can prevent the importation of authentic "Herend" porcelain that is materially different in color, pattern, or shape from the "Herend" porcelain made for sale in the United States); Lever Brothers Co. v. United States, 981 F.2d 1330, 25 USPQ2d 1579 (D.C. Cir. 1993) (in action against Customs Service, "Sunlight" brand dishwashing liquid sold in Great Britain by Lever-UK was required to be excluded because materially different from the "Sunlight" dishwashing liquid sold in the United States by Lever-US; third party importation was an act of trademark infringement).
 
 
 17
 These decisions implement the reasoning that the consuming public, associating a trademark with goods having certain characteristics, would be likely to be confused or deceived by goods bearing the same mark but having materially different characteristics; this confusion or deception would also erode the goodwill achieved by the United States trademark holder's business. Thus the basic question in gray market cases concerning goods of foreign origin is not whether the mark was validly affixed, but whether there are differences between the foreign and domestic product and if so whether the differences are material.
 
 
 18
 The courts have applied a low threshold of materiality, requiring no more than showing that consumers would be likely to consider the differences between the foreign and domestic products to be significant when purchasing the product, for such differences would suffice to erode the goodwill of the domestic source. As explained in Nestle, "[a]ny higher threshold would endanger a manufacturer's investment in product goodwill and unduly subject consumers to potential confusion by severing the tie between a manufacturer's protected mark and its associated bundle of traits." 982 F.2d at 641, 25 USPQ2d at 1263. This criterion readily reconciles cases that have permitted parallel importation of identical goods, such as the Lladro figurines in Weil Ceramics (consumers not deceived, and no erosion of goodwill) and those that have barred importation based on material differences, such as the "Perugina" chocolate in Nestle. This criterion was applied by the Commission in reviewing the used "Kubota" tractor importations.
 
 The "Kubota" Importations
 
 19
 The ALJ found that twenty-four models of the "Kubota" Japanese tractors imported by Gamut were materially different from any corresponding tractor imported by Kubota-US, and that one model was substantially the same. The ALJ found that the twenty-four tractor models differed in at least one of the following characteristics: structural strength, maximum speed, power take-off speed, wheel-base and tread-width dimensions, existence of a power take-off shield, and existence of a hydraulic block outlet. The ALJ found that certain parts for these models were not available in the United States, that the service necessary for these tractors differed from the service available for the United States models, that the used Japanese tractors lacked English warning labels and instructions, and that the Kubota-US dealers did not have English-language operator or service manuals for the Japanese models. Finding these differences to be material, the ALJ found that these used tractors bearing the trademark "Kubota" infringed the United States "Kubota" trademark.
 
 
 20
 The ALJ found that one used tractor model, the Kubota L200, was not materially different from a corresponding model imported and sold by Kubota-US, and that although the labels and instructions on the tractor were in Japanese, the English language instruction and service manuals, warning labels, and parts available for the corresponding United States model were applicable to the Japanese Kubota L200. The ALJ concluded that the imported used Kubota L200 tractor did not infringe the "Kubota" United States trademark.
 
 
 21
 The Commission adopted the ALJ's Initial Decision as to the twenty-four models found to be infringing, and reversed the determination of no infringement by the Kubota L200. The Commission also found infringement by twenty additional tractor models not reviewed by the ALJ. For the Kubota L200 and the twenty additional models, the Commission found that the absence of English-language warning and instructional labels constituted a material difference from the "Kubota" brand tractors sold in the United States by Kubota-US, giving rise to trademark infringement by these unauthorized imports and violation of Section 337.
 
 The Question of Material Differences
 
 22
 Gamut argues that the ITC erred in finding that there are material differences between their imported tractors and those imported by Kubota-US. Gamut points out that materiality of product differences is determined by the likelihood of confusion of those whose purchasing choice would be affected by knowledge of the differences, see Nestle, 982 F.2d at 643, 25 USPQ2d at 1264, and that its purchasers know that they are purchasing a used Japanese tractor. Gamut states that a purchaser of a used tractor bearing Japanese labels would not be deceived into thinking that he/she is buying a new tractor designed for the United States market. Gamut states that any differences between the imported models and the United States models are readily apparent, and thus can not be a material difference.
 
 
 23
 The ITC rejected this argument, finding that it is not reasonable to expect that purchasers of used Kubota tractors will be aware of structural differences from the United States models and of the consequences of these differences for purposes of maintenance, service, and parts. This finding was supported by substantial evidence. Indeed, the marking of these tractors with the "Kubota" mark weighs against an inference that purchasers would be expected to be aware of or expect structural differences.
 
 
 24
 As precedent illustrates, differences that may be readily apparent to consumers may nevertheless be material. In Nestle the court found differences in quality, composition, and packaging to be material. In Martin's Herend the court found differences in the color, pattern or shape of porcelain figures to be material, although they would be apparent to an observer of the products side-by-side. Differences in labeling and other written materials have been deemed material, on the criteria of likelihood of consumer confusion and concerns for the effect of failed consumer expectations on the trademark holder's reputation and goodwill. See Original Appalachian Artworks (Spanish-origin "Cabbage Patch Kids" dolls were materially different because they had Spanish-language instructions and "adoption papers"); PepsiCo v. Nostalgia Products Corp., 18 USPQ2d 1404, 1405 (N.D. Ill. 1990) (materiality based on Mexican "Pepsi" labels that were in Spanish and did not contain a list of ingredients, along with quality control and marketing differences); Fender Musical Instruments Corp. v. Unlimited Music Center Inc., 35 USPQ2d 1053, 1056 (D. Conn. 1995) (material difference for guitars with Japanese language owner's manuals); Osawa & Co. v. B&H Photo, 589 F. Supp. 1163, 1169, 223 USPQ 124, 127 (S.D.N.Y. 1984) (material difference for camera equipment with foreign language instruction manuals); Ferrero U.S.A, Inc. v. Ozak Trading Inc., 753 F. Supp. 1240, 1243-44, 18 USPQ2d 1052, 1055 (D.N.J. 1991) (material differences in the print and content of labels on "Tic-Tac" mints).
 
 
 25
 The Commission found that the imported used "Kubota" tractors lacked English instructional and warning labels, operator manuals, and service manuals. Labels are attached at various places on the tractor to instruct the user on the proper operation of the tractor and to warn of potential hazards, and include instructions on the direction of the engine speed hand throttle, the function of the transmission, the four-wheel drive, the power take-off speed, hydraulic power lift, and other controls on the tractor. The Commission found that such labels are necessary to safe and effective operation. The authorized "Kubota" tractors bear these labels in English; the permanent labels on the used imported tractors are in Japanese.
 
 
 26
 While it would be obvious to the purchaser that the warning and instructional labels are in Japanese, there was evidence before the ITC of consumer belief that the used tractors were sponsored by or otherwise associated with the Kubota-US distributorship/service system. The ALJ heard evidence that a purchaser of such a used tractor knew the tractor bore Japanese labels, but did not realize that he was not buying an authorized tractor or that service and parts were not available from the Kubota-US dealerships. Gamut contends that Kubota-Japan and Kubota-US form a single enterprise and thus that Kubota-US can and should provide any parts, service, maintenance, and repairs required by these used tractors. The ALJ found that in order to service the Gamut-imported tractors in the same manner as Kubota-US provides for its authorized tractors, the dealerships and service agencies would require an additional inventory of parts for the various Japan-only models, English-language operator manuals and service manuals that do not now exist, and additional service training as to the different models. There was testimony from a Kubota-US dealer that he had tried to service several of the imported used tractors in order to preserve the reputation and goodwill of the mark, but that he was unable to do so satisfactorily since he had neither technical information nor replacement parts. He testified to customer dissatisfaction and anger with his dealership. The ALJ heard testimony that it would cost millions of dollars to provide equivalent support in the United States for the tractors that are made for use only in Japan. Gamut disputes these assertions and argues that most of the used tractors could be readily serviced without extraordinary effort. However, the record contains substantial evidence in support of the ALJ's findings. Further, materiality does not turn on whether extraordinary effort would be required for Kubota to service the Gamut-imported tractors; the threshold is not so high or the burden of establishing materiality so heavy.
 
 
 27
 The Kubota companies are not required to arrange to provide service to Gamut's imports in order to ratify these importations by mitigating their injury to the goodwill associated with the "Kubota" trademark. Whether or not the Kubota companies could arrange to service these tractors does not convert an otherwise infringing activity into an authorized importation. See Osawa, 589 F. Supp. at 1167-68, 223 USPQ2d at 126-27 (trademark holder incurred damage from the unauthorized importation of gray market cameras because it voluntarily bore the warranty expenses for servicing them).
 
 
 28
 In addition to the differences in labeling, service, and parts, the ALJ found that many of the tractors designed by Kubota for use in the United States are stronger structurally than the corresponding tractors made for use in Japan. For example, the ALJ found that some of the intended United States tractors were made with stronger front and rear axles, front axle brackets, chassis, power trail, and parts contained in the transmission, such as gears. The ALJ found that the stronger gears increase load-bearing capacity and bending strength, thereby reducing wear and tear. The ALJ found that some of the tractor models designed for the United States market have a stronger power take-off shaft, installed to accommodate the heavy load placed on the shaft by implements often used in the United States such as a rear cutter. The ALJ heard evidence that these structural differences significantly increase the likelihood of breakdowns of the less strong Japanese models. Although Gamut points to the absence of evidence of actual breakdown, the conceded or established differences in structural strength are relevant to the finding of material differences, and were properly considered by the Commission, along with the evidence concerning labelling, warnings, service, and parts.
 
 
 29
 Gamut raises the additional argument that in all events the Commission erred in law by applying the material differences test with the low threshold of precedent, because the imported tractors are not new but used. Gamut states that the Commission should have applied a more stringent test, namely, that differences which are easily ascertained by the consumer can not be material. Gamut also argues that the Commission erred in ruling that differences that are easily apparent to the consumer, such as differences in structural strength and availability of parts and service, are material. We conclude that the Commission applied the correct standard, for this standard implements the two fundamental policies of trademark law: to protect the consumer and to safeguard the goodwill of the producer. The Commission did not err in finding no factual basis for assuming, as Gamut proposes, that the purchaser of a used tractor should be charged with the knowledge or awareness that replacement parts may not be available.
 
 
 30
 Substantial evidence supports the Commission's finding that consumers would consider the differences between the used imported tractors and the authorized Kubota-US tractors to be important to their purchasing decision, and thus material.
 
 Effect of the Fact that the Goods are Used
 
 31
 Gamut argues that this is not a "gray market" case because the imported tractors are simply durable used goods, rendering it irrelevant whether the trademark owner authorized their sale in the United States. Gamut also argues that imported goods must be sold in competition with the goods of the owner of the United States trademark in order for authentic foreign-marked goods to infringe any trademark rights, citing K Mart v. Cartier, 483 U.S. at 286, 6 USPQ2d at 1899-00. Gamut asserts that because Kubota-US sells new tractors in the United States and the respondents sell only used tractors, the goods are not in direct competition and the imported used tractors can not be held to be infringing gray market goods.
 
 
 32
 Direct competition between substantially identical goods is a factor to be considered, but it is not a prerequisite to trademark infringement. In Safety-Kleen Corp. v. Dresser Indus., 518 F.2d 1399, 1404, 186 USPQ 476, 480 (CCPA 1975) the court explained that "While the similarity or dissimilarity of the goods or service should, in appropriate cases, be considered in determining likelihood of confusion . . . the law has long protected the legitimate interests of trademark owners from confusion among noncompetitive, but related, products bearing confusingly similar marks." Similar reasoning applies to products of the gray market.
 
 
 33
 As we have discussed, trademark law as applied to gray market goods embodies a composite of likelihood of consumer confusion as to the source of the goods, likelihood of consumer confusion arising from differences between the foreign and the domestic goods, impositions on the goodwill and burdens on the integrity of the United States trademark owner due to consumer response to any differences, and recognition of the territorial scope of national trademarks. Various of these factors acquire more or less weight depending on the particular situation. Although it is relevant to consider whether the imported product is new or used, other factors that may affect the reputation and the goodwill enuring to the holder of a trademark are not overridden by the fact that the product is known to be second-hand.
 
 
 34
 Courts that have considered the question and concluded that used goods can be gray market goods include Red Baron-Franklin Park, Inc. v. Taito Corp., 883 F.2d 275, 11 USPQ2d 1548 (4th Cir. 1989) (used circuit boards purchased abroad and imported into the United States without the copyright holder's consent were gray market goods); Sims v. Florida Dep't of Highway Safety and Motor Vehicles, 862 F.2d 1449, 1451 (11th Cir. 1989) (used Mercedes Benz automobiles were gray market goods under definition of Clean Air and Safety Act); Sturges v. Clarke D. Pease, Inc., 48 F.2d 1035, 1038 (2d Cir. 1931) (barring importation of used HISPANO SUIZA automobile because it bore United States registered trademark).
 
 
 35
 The ALJ found that Kubota-US has established a reputation for safety, reliability, and service that consumers associate with the "Kubota" mark, and that the used tractors bearing the "Kubota" mark undermine the investment that Kubota-US made in consumer goodwill for "Kubota" products. These findings are supported by substantial evidence. The fact that the imported tractors are used does not prevent a finding of infringement of the United States "Kubota" trademark.
 
 Goodwill of the United States trademark
 
 36
 Gamut points out that according to the trademark license agreement, Kubota-Japan owns the "Kubota" trademark in the United States and associated goodwill. Gamut argues that there can be no infringement of the United States trademark unless Kubota-Japan, as the trademark owner, demonstrates that it "has developed domestic goodwill, that is, independent of the goodwill associated with the mark world wide." The goodwill of a trademark is developed by use of the mark. The ALJ found that Kubota-US, through its large network of authorized dealers in "Kubota"-brand products, had established a reputation for product quality and service throughout the United States, establishing use of the mark accompanied by goodwill. This goodwill enures to the benefit of the trademark owner. Gamut's challenge to the standing of the complainants is not well founded.
 
 Remedy
 
 37
 The ALJ recommended imposition of a general exclusion order as to the infringing tractor models, barring their importation and sale unless the tractors bore a permanent, non-removable label alerting the consumer to the origin of the used tractors and containing other information deemed necessary to mitigate consumer confusion. The ALJ also recommended that cease and desist orders be issued to bar the respondents from selling infringing used tractors already imported unless the tractors were appropriately labeled. The Commission, on giving full review to the ALJ's Initial Decision, including various modifications thereof, affirmed the ALJ's ruling that the vinyl decal label that was proposed by Gamut would not eliminate the likelihood of consumer confusion because of the high likelihood that the labels would be removed after importation and prior to sale.
 
 
 38
 After the Commission's Final Decision was issued Gamut filed a request for reconsideration and proposed use of a metal riveted label. The Commission denied reconsideration on two grounds. First, the Commission held that the issue of permanently affixed labels was before the ALJ when he made his Initial Decision, and again before the Commission when it made its remedy determination and issued its Final Decision, yet Gamut did not propose any label other than the vinyl decal. Thus the Commission held that Gamut's proposal did not raise any new factual or legal issues, see 19 C.F.R. '210.47 (stating the criteria for reconsideration), and declined reconsideration. Second, the Commission stated that even if the question were properly before it, Gamut did not provide sufficient evidence to establish that its new proposed labels would not be removed prior to the first sale. Reversible error has not been shown in these findings and rulings of the Commission.
 
 
 39
 The Commission has broad discretion in selecting the form, scope and extent of the remedy in a Section 337 proceeding. Although not insulated from judicial review, see Hyundai Electronics v. United States Int'l Trade Comm'n, 899 F.2d 1204, 1208-09, 14 USPQ2d 1396, 1400 (Fed. Cir. 1990), the Commission's choice of remedy shall be sustained unless it is arbitrary, capricious, or an abuse of the Commission's discretion. Id. at 1209, 14 USPQ2d at 1400. Gamut contends that the Commission abused its discretion because the remedial orders impose a hardship on the appellants, because there is no exception permitting sale of tractors already imported, and because only the appellants are subject to the Commission's orders, leaving others free to import and sell used Kubota tractors.
 
 
 40
 An exclusion order is the Commission's statutory remedy for trademark infringement. 19 U.S.C. '1337(d). In addition, the Commission may issue cease and desist orders when it has personal jurisdiction over the party against whom the order is directed. 19 U.S.C. '1337(f). There is no dispute that the Commission has personal jurisdiction over the named respondents. Whether every actual or potential dealer in infringing goods was joined in this action does not excuse those over whom the Commission had jurisdiction.
 
 Accordingly, the Commission's decision is
 
 41
 AFFIRMED.
 
 
 
 NOTES:
 
 
 *
 Circuit Judge Rich heard argument of the appeal; upon his death, the appeal has been decided by the remainder of the panel. Fed. Cir. Rule 47.11
 
 
 [1]
 Certain Agricultural Tractors Under 50 Power Take-Off Horsepower, Inv. No. 337-TA-380, USITC Pub. 3026 (March 1997).